**STATE of Missouri, Respondent,**

v.

**Mark A. CHRISTESON, Appellant.**

No. SC 82082.

Supreme Court of Missouri,
En Banc.

June 26, 2001.

Rehearing Denied Aug. 21, 2001.

Janet M. Thompson, Office of State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. General, Linda Lemke, Assistant Attorney General, Jefferson City, for respondent.

LIMBAUGH, Judge.

This is an appeal of defendant Mark A. Christeson's conviction and death sentence for the 1998 murders of Susan Brouk and her two children, Adrian and Kyle. Because the death penalty was imposed, this Court has exclusive jurisdiction of the appeal. Mo. Const. art. V, sec. 3. The judgment is affirmed.

## I. BACKGROUND

### A. Factual Overview

■ The facts, which this Court reviews in the light most favorable to the verdict, *State v. Johns*, 34 S.W.3d 93, 103 (Mo. banc 2000), *cert. denied,* — U.S. —, 121 S.Ct. 1745, 149 L.Ed.2d 668 (2001), are as follows:

On Saturday, January 31, 1998, Christeson, 18, and his cousin Jesse Carter, 17, who were living in the home of a relative, David Bolin, concocted a plan to run away. The Bolin home was located in a rural area near Vichy, Missouri. Susan Brouk, along with her children, twelve year old Adrian and nine year old Kyle, lived about a half mile away. On Sunday morning, February 1, 1998, after Mr. Bolin left for work, Christeson and Carter each took shotguns and went to Ms. Brouk's home. After hiding outside for a few minutes, they entered the home and found Adrian and Kyle sitting on the living room floor. Ms. Brouk came in from the kitchen and encountered Carter binding her children's hands with shoelaces that he had brought for that purpose. Christeson forced Ms. Brouk into her daughter Adrian's bedroom at gunpoint, where he then raped her on Adrian's bed. When Christeson brought her back out to the living room, Carter bound her hands behind her back with a

piece of yellow rope. Ms. Brouk said "you had your fun, now get out." At some point during the confrontation, Ms. Brouk and Kyle were both struck in the head with a blunt object.

About that time, Adrian recognized Carter and said "J.R.," Carter's nickname, and "Jesse Carter," which prompted Christeson to tell Carter "we got to get rid of 'em." They forced Ms. Brouk and her children into the back seat of Ms. Brouk's Bronco and also loaded her television, VCR, car stereo, video game player, checkbook, and a few other small items. Christeson drove down the highway, down a gravel road, and then across a neighbor's field to a pond at the edge of a wooded area.

They forced Ms. Brouk and her children to the bank of the pond. Christeson kicked Ms. Brouk just below her ribs with enough force that she was knocked to the ground. Christeson then placed his foot on her mid-section, and reached down and cut her throat with a bone knife. She bled profusely, but she did not die immediately, and as she lay on the bank of the pond, she told Adrian and Kyle that she loved them. Then Christeson cut Kyle's throat twice and held him under the pond water until he drowned. Carter pushed Kyle's body farther out into the pond so the body would sink. At Christeson's direction, Carter retrieved cinder blocks from a nearby barn, and while there, heard Christeson fire a shot from one of the shotguns. When Carter returned to the pond, Adrian was struggling to free herself from Christeson. Carter held Adrian's feet while Christeson pressed down on her throat until she suffocated, and Carter then pushed Adrian's body into the pond. While Ms. Brouk was still alive, but barely breathing, Christeson grabbed her arms and Carter grabbed her legs, and they threw her into the pond on top of her

children's bodies. As she drowned, Carter went into the woods to get a long stick, which he used to push the Brouks' bodies further out into the pond.

Christeson and Carter returned to Mr. Bolin's property in the Bronco and parked it near a garbage pile. They took one of the shotguns back into Mr. Bolin's house, loaded their personal belongings into an Oldsmobile, and then drove the Oldsmobile back to the garbage pile and transferred their belongings to the Bronco. At that point, they drove off in the Bronco, eventually heading west on Interstate 44.

Ms. Brouk's sister, Kay Hayes, thought it was unusual that Ms. Brouk and her children did not come to Sunday dinner, as planned, but she was not concerned until Tuesday evening, when she called Ms. Brouk's home and there was no answer. That evening Ms. Hayes called another sister, Joy Lemoine, to inquire if she had heard from Ms. Brouk, but she had had no contact either. When family members went to Ms. Brouk's house the next evening, they discovered that Ms. Brouk's prescription glasses and the children's and Ms. Brouk's coats were still in the house and that the television, VCR, and Bronco were missing. They called the police, and that night officers from the Maries County Sheriff's Department secured the home and searched the premises.

The next morning, officers in a Missouri State Highway Patrol helicopter conducting an aerial search spotted a body floating in a pond located slightly southeast of the Brouk's residence. After landing the helicopter in a field just south of the pond, they found the bodies of Ms. Brouk, Adrian, and Kyle partially submerged. The officers then investigated the area around the pond and found a sixteen-gauge shotgun shell on the south bank, some leaves and soil splattered with blood, shoe impressions, and two cinder blocks on the

west bank near the area where the bodies were recovered. There were also tire impressions leading from the pond to the garbage pile on Mr. Bolin's property where Christeson and Carter had parked the Bronco.

In the meantime, Christeson and Carter were driving from Missouri to California. On the way, they sold several items of Ms. Brouk's property to pay for gas and food. Christeson also pawned the sixteen-gauge shotgun at a pawnshop in Amarillo, Texas. On February 9, 1998, a detective with the Riverside County Sheriff's Department, stationed in Blythe, California, recognized Christeson and Carter from their photographs on a flyer that had been circulated by law enforcement officials, and later that day the fugitives were arrested.

Missouri officials continued to investigate the crimes. A medical examiner's autopsy report showed that the cuts to Ms. Brouk's neck were not severe enough to cause her death immediately and that the actual cause of death was drowning. Autopsies also revealed that Ms. Brouk and Kyle had hemorrhaging or bleeding under the scalp, indicating a blunt impact injury or blow to the head, and that there were two superficial cuts across Kyle's neck, but that he, too, died from drowning. Adrian died from suffocation, but there also was a small, shallow puncture wound in Adrian's left arm that could have been caused by a pellet from a shotgun shell, although no pellet was present. DNA testing performed by the Missouri State Highway Patrol Crime Laboratory established that genetic material from semen recovered from Ms. Brouk's body and from Adrian's sheets matched Christeson's genetic profile. Firearms-identification testing established conclusively that the sixteen-gauge shotgun that Christeson pawned in Texas was the one that fired the shell found on the bank of the pond.

## B. Proceedings at Trial

The case was tried in Vernon County on a change of venue from Maries County. The state's evidence was that set out above in the factual overview. Defendant Christeson took the witness stand to deny his involvement in the murders. He testified that he had a secret sexual relationship with Ms. Brouk and that at about noon on Saturday, January 31, 1998, he had sex with her on Adrian's bed. In addition, he claimed that on the morning of February 1, 1998, Carter stole Ms. Brouk's Bronco and asked Christeson to run away with him and that Christeson did so simply because he, too, wanted to run away.

The jury returned verdicts of guilty for each of the three counts of murder in the first degree and the case proceeded to the penalty phase. The state's witnesses included Mike Wagner, who testified that Christeson sodomized him when they shared a cell in February 1999, while incarcerated in the Vernon County jail. Among the state's other witnesses was Ms. Brouk's younger sister, Joy Lemoine, who gave victim impact testimony. In mitigation, the defense called Christeson's mother, aunt, and former girlfriend, each of whom testified about Christeson's difficult, abusive and unhappy upbringing. The defense also called Dr. Wanda Draper, a psychologist, who confirmed that Christeson had several unresolved traumatic experiences from his childhood.

At the conclusion of penalty phase, the jury found four aggravating circumstances in the murder of Ms. Brouk: that the murder was committed during the unlawful homicide of her daughter, Adrian; that the murder was committed during the unlawful homicide of her son, Kyle; that the murder was committed during the perpetration of rape; and that the murder involved depravity of mind and

was therefore outrageously and wantonly vile, horrible, and inhuman. The jury found three aggravating circumstances in the murders of Adrian and Kyle: that the murders were committed during the unlawful homicide of their mother; that the murders were committed during the unlawful homicide of each other; and that the murders involved depravity of mind and were therefore outrageously and wantonly vile, horrible, and inhuman. The jury returned verdicts of death on all three counts. On October 8, 1999, the trial court imposed sentence in accordance with the recommendation of the jury. This appeal followed.

## II. ALLEGATIONS OF PRE-TRIAL ERROR

### A. Defense Counsel's Motion To Withdraw

Christeson claims that the trial court erred in denying his trial counsel's motion to withdraw as his attorney, thereby denying him his rights to due process, a fair trial, conflict-free counsel, effective assistance of counsel, and freedom from cruel and unusual punishment as provided under amendments V, VI, VIII, and XIV of the United States Constitution and article I, sections 10, 18(a), and 21 of the Missouri Constitution. Christeson relies on these same federal and state constitutional provisions for each point of error on appeal.

The motion to withdraw, filed about three months before trial, was based on a conflict of interest asserted by Valerie Leftwich, one of Christeson's two trial attorneys. At the hearing on the motion, Leftwich explained that several years ago she had represented Michael Gibbs, whom the state had endorsed as a witness, in an unrelated matter and that she was in possession of confidential information regarding that representation. Ms. Leftwich believed that a conflict of interest existed

under the Rules of Professional Conduct because she might be forced to disclose the confidential information if the state called Gibbs as a witness and she had to cross-examine him. Alternatively, Ms. Leftwich believed that if the defense needed to call Gibbs, the state would be able to cross-examine him to show that he testified favorably for Christeson because of his connection with Ms. Leftwich. In response to these concerns, the prosecutor stipulated on the record that Gibbs would not be called as a witness for the state. However, one of the state's penalty phase witnesses, Robert Milner, brought Gibbs into the case, at least tangentially, by testifying that while he was in jail with Christeson and Gibbs, he overheard Christeson tell Gibbs, "Of course I did, but they ain't got shit on me." The statement went unchallenged, although it was unclear whether Christeson was referring to the murders, the jail house sodomy, or some other misconduct. In any event, Christeson also claims that Ms. Leftwich's conflict prevented her from calling Gibbs to dispute that the statement was made.

■ As a preliminary matter, the state, citing *State v. Owsley*, 959 S.W.2d 789, 793 (Mo. banc 1997), *cert. denied*, 525 U.S. 882, 119 S.Ct. 191, 142 L.Ed.2d 156 (1998); *State v. Giaimo*, 968 S.W.2d 157, 159 (Mo. App.1998); and *State v. Mitchell*, 41 S.W.3d 574 (Mo.App.2001), argues that this Court need not address the claim because it is actually a claim of ineffective assistance of counsel, which is not reviewable on direct appeal. *Owsley* involved a similar claim that the trial court erred in denying the defendant's motions to dismiss his counsel because there was an alleged conflict between the defendant and his lawyer. *Owsley*, 959 S.W.2d at 792. This Court held that the claim of conflict should have been presented in a Rule 29.15 motion, but only to the extent that the claim

was based on counsel's alleged misconduct at trial. *Id.* at 793. Conversely, to the extent that the claim of conflict was based on the trial court's actual ruling on the motion, the claim was properly brought as part of the direct appeal. Neither *Giaimo* nor *Mitchell* holds differently. Here, Christeson's claim is not based on counsel's alleged misconduct or ineffectiveness at trial, but rather trial court error in failing to grant the motion to withdraw, and ineffective assistance of counsel is only an alleged potential consequence of the trial court error.

■ On the merits, the determination of whether defense counsel should be allowed to withdraw is a matter within the discretion of the trial court, and this Court's review is for abuse of that discretion. *State v. Hornbuckle*, 769 S.W.2d 89, 96 (Mo. banc 1989), *cert. denied*, 493 U.S. 860, 110 S.Ct. 171, 107 L.Ed.2d 128 (1989). Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *State v. Gardner*, 8 S.W.3d 66, 73 (Mo. banc 1999).

■ Christeson relies on two provisions of the Rules of Professional Conduct, Rule 4–1.6(a) and Rule 4–1.7(b), to argue that Ms. Leftwich had a conflict of interest. Rule 4–1.6(a), states in pertinent part that "[a] lawyer shall not reveal information relating to representation of a client unless the client consents after consultation. . . ." Rule 4–1.7(b) states in pertinent part that "[a] lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client." These rules, however, are not implicated in this situation. Because the state agreed not to call Gibbs as a witness, Ms. Leftwich had no need to cross-examine him with confiden-

tial information she may have obtained from the earlier representation. Furthermore, there is simply no record that any of the supposed confidential information was even potentially relevant to Christeson's case. The alleged conflict based on Gibbs' availability as a defense witness fares no better. It is pure speculation that Gibbs would have testified favorably for Christeson, and the defense made no offer of proof to that effect. Assuming Gibbs would have so testified, the argument that the State might gain some counter advantage by cross-examining Gibbs to suggest that his testimony favored Christeson because of Gibbs' relationship with Ms. Leftwich is tenuous, at best. The defense fails to explain how or why that prior relationship could have influenced Gibbs' testimony, much less that the state would have pursued such a seemingly pointless matter on cross-examination. In the absence of a real, rather than perceived, conflict of interest, the trial court did not abuse its discretion in denying the motion to withdraw.

**B. Denial of Continuance**

Christeson claims that the trial court erred in denying his request for a continuance based on the state's endorsement of Carter as a witness only thirteen days before trial. Due to the late endorsement, Christeson alleges that he was not afforded an adequate opportunity to investigate and challenge Carter's testimony and to interview doctors who evaluated Carter's mental health.

■ The decision to grant a continuance is within the sound discretion of the trial court. *State v. Wolfe*, 13 S.W.3d 248, 261 (Mo. banc 2000), *cert. denied*, 531 U.S. 845, 121 S.Ct. 114, 148 L.Ed.2d 70 (2000). Reversal is warranted only upon a very strong showing that the court abused its discretion and prejudice resulted. *State v.*

*Middleton,* 995 S.W.2d 443, 465 (Mo. banc 1999). A continuance for counsel's trial preparation is not warranted when counsel had adequate time to prepare. *Id.*

■ Carter's identity and involvement were known to defense counsel for almost a year and a half before the trial began. His confession was provided fourteen months before trial. Defense counsel conducted a more than six hour long deposition of Carter two weeks before he testified. At trial, defense counsel called two of Carter's psychological evaluators and questioned them in detail about Carter's mental health issues. Christeson has not shown what evidence he would have developed had a continuance been granted; thus, he has not made the required strong showing of prejudice. *See State v. Thompson,* 985 S.W.2d 779, 785 (Mo. banc 1999); *Middleton,* 995 S.W.2d at 465.

## III. VOIR DIRE

### A. Refusal to allow individual questioning

Christeson argues that the trial court erred by overruling his motions to allow individual questioning during voir dire, which, he alleges, was necessitated by pre-trial publicity. Christeson does not allege that any persons who served on his jury actually held opinions that prevented them from impartially deciding his guilt or innocence. Instead, his allegation, as we understand it, is that in light of a newspaper article published the day before jury selection began, the questioning the trial court allowed during voir dire was insufficient to ensure that the jury was impartial.

The newspaper article appeared on the front page of the Nevada Daily Mail on August 25, 1999. It reported, based on preliminary hearing testimony later excluded by the court, that trouble between Christeson and Ms. Brouk began in January 1998, when she asked Christeson and Carter not to hunt on her property because her son played outside. The article also stated that Adrian Brouk had tried to escape, but Christeson captured her, which was not part of the trial testimony. The article also noted that Christeson would be brought to the courtroom early each morning so the jurors would not see him in leg irons and shackles.

■ Individual voir dire is not required in death penalty cases. *State v. Brown,* 998 S.W.2d 531, 546 (Mo. banc 1999), *cert. denied,* 528 U.S. 979, 120 S.Ct. 431, 145 L.Ed.2d 337 (1999). Control of voir dire is within the discretion of the trial judge; only abuse of discretion and likely injury justify reversal. *State v. Barton,* 998 S.W.2d 19, 25 (Mo. banc 1999), *cert. denied,* 528 U.S. 1121, 120 S.Ct. 945, 145 L.Ed.2d 823 (2000). The trial court abuses its discretion only if the voir dire permitted does not allow for the discovery of bias, prejudice, or partiality. *Id.* The relevant question is not whether there was publicity about a case, or even whether a venireperson had formed an opinion based on pre-trial publicity, but whether the jurors had such fixed opinions about the case that they could not impartially judge the defendant's guilt or innocence under the law. *Id.*

■ To address the concern about potential publicity, the court allowed counsel to ask whether any venirepersons had read the newspaper article or had otherwise been exposed to pre-trial publicity about Christeson's case and, if so, whether they had formed an opinion about his guilt or innocence as a result. Additionally, as to those venirepersons who had formed an opinion, counsel was allowed to ask whether they could set aside that opinion and decide Christeson's guilt or innocence based solely on the evidence presented at trial. To alleviate Christeson's particular-

ized concern that prospective jurors who had not read the article might be exposed to the content of the article during voir dire, the court divided the jurors into small groups for questioning and prohibited inquiries about the jurors' specific recollections of the content of the article. Most important, the record is clear that none of the jurors selected for the trial indicated that they held an opinion about Christeson's guilt before the evidence was presented or that they could not decide his guilt or innocence based on the evidence. For these reasons, the trial court did not abuse its discretion in denying individual voir dire.

■ Christeson also raises the related claim that the trial court erred in denying his motions to strike two jurors, Gary Ashby and Elaine Allen, for cause because of their exposure to the newspaper article. Contrary to Christeson's assertion, the record shows that neither juror actually read the article, but that both merely heard other people talking about it. Furthermore, both jurors said they had not formed any opinion about Christeson's guilt and would decide the case on the evidence presented. The trial court did not abuse its discretion in denying the motions to strike for cause. *See State v. Smith*, 32 S.W.3d 532, 544 (Mo. banc 2000); *State v. Johnson*, 22 S.W.3d 183, 187 (Mo. banc 2000), *cert. denied*, 531 U.S. 935, 121 S.Ct. 322, 148 L.Ed.2d 259 (2000).

### B. Venireperson Kent Thompson

Christeson claims that the trial court erred in striking venireperson Kent Thompson for cause at the state's request. In response to the voir dire questions, Thompson first indicated that he could vote to impose the death penalty, then said he was uncertain, then said he could not sign his name on the verdict form as a foreperson, and finally said he could "con-

sider" the death penalty. These responses, according to Christeson, did not disqualify Thompson from serving.

During voir dire, the following dialogue took place:

PROSECUTOR: Having reached the final point of decision ... could you vote for life in prison without parole?

VENIREPERSON THOMPSON: Yes.

Q: Could you vote for the other alternative of the death penalty?

A: Yes.

Q: Is there any hesitation, sir? You seem to be thinking about that as you were getting ready to answer, and certainly giving something some thought is often a good idea.

A: It would be hard.

Q: Okay. Would it be fair to say you have some uncertainty about one or the other of those penalties?

A: Uncertainty about death.

The subject was addressed again during later questioning:

PROSECUTOR: You were saying you had a hard time with the death penalty if I understood what you were saying; correct?

VENIREPERSON THOMPSON: Yes.

Q: Mr. Thompson, I want you to assume that not only are you on this jury but that you have been elected foreperson of the jury. I will tell you that while the jury—the vote of jury [sic] must be unanimous as to punishment, either for life or for death, that the foreperson of the jury would be the person that would come out and announce the verdict in open court. Do you think you could come out into open court and announce a death verdict?

MS. LEFTWICH: I'm going to object, your honor. I think is [sic] inappropriate line of questioning under the law,

and it misstates the law. He doesn't have to come out and announce the verdict. The foreperson signs on the line.

PROSECUTOR: Well, I'll get to that too, and I think this line of questioning is specifically approved by the Supreme Court.

THE COURT: The court will overrule that objection. Go ahead.

PROSECUTOR: You may answer, sir.

VENIREPERSON THOMPSON: Would you repeat that again.

Q: All right, understand that while the verdict must be unanimous, that when the jury comes out, it is the foreperson of the jury who turns over the verdict and announces the death verdict if that were your conclusion in open court. Do you think you could do that?

A: No.

Q: No. I'll ask the next question just to make it clear. I will tell you again that while the verdict must be unanimous, the verdict is signed by the foreperson alone. Could you sign a death verdict?

A: No.

Thereafter, defense counsel questioned Mr. Thompson in an attempt to rehabilitate him:

MS. LEFTWICH: One more, Mr. Thompson. I missed you for a minute. Okay, again are you telling me—you talked to Mr. Ahsens previously about the death penalty. I think you finally indicated that you wouldn't be—you didn't think you [could] sign a verdict form imposing the death penalty; is that correct?

VENIREPERSON THOMPSON: Yes.

Q: Could you—Could you consider the death penalty after you had found someone guilty of one, two or three first degree murders?

A: Yes.

Q: Okay you will be able to consider it?

A: (Nods head.)

Q: Is that yes?

A: Yes.

In striking venireperson Thompson for cause, the court stated:

[M]y impression was that he was not ... for the death penalty. He had a hard time even saying—looking at him and watching him, he'd look down and, very softly, he said—he finally said he might be able to vote for the death penalty. But he never said he could sign a verdict. I think I'm going to strike ... as not being able to realistically, I think, substantially comply with the law.

▬ A trial court's ruling on a challenge for cause will be upheld on appeal unless it is clearly against the evidence and is a clear abuse of discretion. *State v. Smith,* 32 S.W.3d 532, 544 (Mo. banc 2000). "The relevant question is whether a venireperson's beliefs preclude following the court's instructions so as to 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *State v. Johnson,* 22 S.W.3d 183, 187 (Mo. banc 2000), *cert. denied,* 531 U.S. 935, 121 S.Ct. 322, 148 L.Ed.2d 259 (2000) (quoting *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). A venireperson's qualifications as a prospective juror are not determined by an answer to a single question, but by the entire examination. *Id.* at 188. The trial court is in the best position to evaluate a venireperson's qualifications to serve as a juror and has broad discretion in making the evaluation. *Id.*

▬ A venireperson's equivocation about his ability to impose the death penalty in a capital case, especially when coupled with an unequivocal statement that he could not sign a verdict of death, provides

a basis to exclude him from the jury. *See Smith*, 32 S.W.3d at 544; *Johnson*, 22 S.W.3d at 186. Christeson's claim, as we understand it, is that the trial court's ruling was based solely on Thompson's unwillingness to sign a verdict of death, which, according to Christeson's reading of *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and other Supreme Court precedents, is alone insufficient to disqualify Thompson from serving. In fact, the Supreme Court has not addressed the precise issue here presented: Whether a prospective juror's unwillingness to sign a death verdict as a jury foreman will "prevent or substantially impair the performance of his duties as a juror . . . ," even though that juror is otherwise willing to consider imposition of the death penalty.

■ In this case, however, it does not matter. Regardless of Thompson's unwillingness to sign a death verdict, he was equivocal in his responses about his ability to impose the death penalty, which is an independent basis for the trial court's discretionary ruling. *State v. Rousan*, 961 S.W.2d 831, 840 (Mo. banc 1998), *cert. denied*, 524 U.S. 961, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998); *State v. Roberts*, 948 S.W.2d 577, 597 (Mo. banc 1997), *cert. denied*, 522 U.S. 1056, 118 S.Ct. 711, 139 L.Ed.2d 652 (1998). Despite Christeson's tacit assumption to the contrary, Thompson's answers to defense counsel's rehabilitative questions did not reconcile with his earlier answers to the state's questions, nor was he asked to reconcile those answers. Under these circumstances, this Court will not dispute the trial court's evaluation that the answers, on the whole, were equivocal and, hence, disqualifying. In light of Thompson's equivocation about imposing the death penalty, and his unequivocal assertion that he could not sign a verdict form assessing the death penalty,

the record supports the conclusion that his views would have substantially impaired the performance of his duties as a juror. The trial court did not abuse its discretion in striking him for cause.

## C. Prosecutor's Improper Comments

■ Christeson next claims that the trial court erred in overruling his objections, and in not declaring a mistrial *sua sponte*, when the prosecutor made nine allegedly improper statements during voir dire. However, only one of the allegedly improper comments was actually preserved for review by a timely objection. The others will be reviewed only for manifest injustice under the plain error rule, Rule 30.20.

■ The preserved claim is that the prosecutor misstated the law in reference to penalty phase when he remarked, "You're no longer interested in whether the defendant is guilty or not guilty; you have already made that decision." To support this claim, Christeson cites *State v. Chaney*, 967 S.W.2d 47, 60 (Mo. banc 1998), *cert. denied*, 525 U.S. 1021, 119 S.Ct. 551, 142 L.Ed.2d 458 (1998), which implies that even when guilt has been decided, residual doubt may linger and influence the jury in the penalty phase. Taken in context, however, the prosecutor's remark was merely an explanation to the jury that in the punishment phase they were to decide punishment, having already determined guilt in the guilt phase. Christeson has not shown that the prosecutor misstated the law.

■ Christeson requests plain error relief regarding the remaining eight comments. Christeson's challenge to one of the comments—that the prosecutor said that the jury's verdict "may" be unanimous—misquotes the comment because the prosecutor actually said "must." The other comments are: 1) "Mr. Garrabrant

is a well-trained and experienced prosecutor. Murder is, however, unusual in Vienna, Missouri, so he has wisely asked for help;" 2) "The defense will present you evidence or argue factors that they feel make the death penalty inappropriate;" 3) "... it's very likely in this case there will be evidence from both sides in the second part;" 4) "You then have to decide whether mitigating circumstances which are offered by the defense outweigh it;" 5) "You understand too, that the defense does not have to prove those mitigating circumstances beyond a reasonable doubt or any other way;" 6) "... any mitigating circumstances that are presented by the defense ... They will present that evidence, you will decide whether you believe it or not;" 7) "The governor has signed them [statutory aggravating circumstances] into law."

■ These statements are improper, Christeson contends, because the prosecutor inserted his personal opinion, compared his case to others, and/or misstated the law, giving the defense a burden of proof or production. However, review of the record shows that, in context, most of these statements were legitimate attempts to explain the mechanics of the trial process and the role of the jury in assessing evidence presented by the state or the defendant. The two comments that may not fit that category are no less innocuous. The comment that "Mr. Garrabrant is a well-trained and experienced prosecutor. Murder is, however, unusual in Vienna, Missouri, so he has wisely asked for help" does not imply any personal opinion about Christeson's case; rather, it suggested that the local prosecutor was inexperienced. The comment that "[t]he governor has signed them [statutory aggravating circumstances] into law" in no way suggested, as Christeson argues, that the governor had decided the aggravators applied to his case. Even if these comments were

somehow erroneous, they do not approach the standard of manifest injustice necessary for plain error relief under Rule 30.20.

## IV. GUILT PHASE

### A. Admission of Photograph

Christeson claims the trial court abused its discretion by admitting an autopsy photograph depicting Ms. Brouk's scalp with the skin pulled back to reveal the injury to her head. His argument is that the photograph should have been excluded because it was offered only to inflame the passions of the jury, and it was irrelevant because no evidence tended to show that Christeson caused Ms. Brouk's head injury.

■ The trial court has broad discretion in determining the admissibility of photographs. *State v. Middleton*, 995 S.W.2d 443, 462 (Mo. banc 1999). "Photographs, although gruesome, may be admitted where they show the nature and location of wounds, where they enable the jury to better understand the testimony, and where they aid in establishing any element of the state's case." *Id.* (quoting *State v. Murray*, 744 S.W.2d 762, 772 (Mo. banc 1988), *cert. denied*, 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988)); *State v. Rhodes*, 988 S.W.2d 521, 524 (Mo. banc 1999).

■ As with the victim in *Rhodes*, Ms. Brouk's hair obscured the area of the injury, and the photograph helped the jury understand the nature and location of her injury. Christeson is correct that no other evidence showed that he inflicted Ms. Brouk's head injury, but his argument overlooks the fact that the presence of the injury itself, attested to by the medical examiner, supports the inference that it was sustained at the time she was murdered. The photograph is therefore relevant. The point is denied.

## B. Improper Bolstering

Christeson claims that the trial court plainly erred in overruling his objections to portions of the state's direct examination of Carter and of Sgt. Roark, the officer who took Carter's confession. His specific claim is that the state was permitted to improperly bolster Carter's testimony. Christeson concedes that review is for plain error under Rule 30.20 because his objection to Carter's testimony was not on the basis of bolstering and his objection to Sgt. Roark's testimony was not included in his motion for new trial. Regardless, there was no error in the first place.

■ "Improper bolstering occurs when an out-of-court statement of a witness is offered solely to duplicate or corroborate trial testimony." *State v. Wolfe*, 13 S.W.3d 248, 257 (Mo. banc 2000), *cert. denied*, 531 U.S. 845, 121 S.Ct. 114, 148 L.Ed.2d 70 (2000). According to Christeson, improper bolstering took place at the conclusion of Carter's direct examination when Carter summarized his testimony. However, this summary did not involve a single out-of-court statement, so no error occurred.

■ Christeson contends that by eliciting testimony from Sgt. Roark after Carter testified that recounted Carter's out-of-court statements, the prosecution guided the jury by repetition into deciding his guilt and penalty. However, defense counsel's cross-examination of Carter, and of other witnesses, tended to show that Carter made contradictory statements and that he may have fabricated his testimony in exchange for a plea agreement. In this situation, Sgt. Roark's testimony was properly admitted as a prior consistent statement. In *State v. Ramsey*, 864 S.W.2d 320, 329 (Mo. banc 1993), *cert. denied*, 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994) (citations omitted), this Court explained that "[p]rior consistent statements are admissible for the purpose of rehabilitating a witness whose credibility has been attacked by an express or implied claim of recent fabrication of trial testimony." There was no error.

## C. Juror Misconduct

Christeson contends that the trial court abused its discretion in denying his motion for a mistrial when, during the state's case, a member of the jury sent a note to the court asking if the jury could see the Bronco. The note, Christeson explains, and the court's later discussions with the juror, revealed that the jury began deliberating before the cause was submitted to them. The note stated, "Judge, Is there any way we can see the actual Bronco? F.J. Jeffries." The court called Ms. Jeffries to the bench and the following conversation occurred:

THE COURT: I'm guessing this is your note is all I'm asking you.

MS. JEFFRIES: Yes, sir.

Q: Okay. Ms. Jeffries, it says here, is there any way we can see the actual Bronco. Is this something that you wanted to see or is this something where—

A: Well, I think we all kind of wanted to but we didn't—we're trying not to discuss it.

Q: You're trying not to discuss it?

A: Right.

Q: But you think we all might want to see it?

A: Yeah.

Q: Okay.

A: We all had a question about whether the windows were tinted or not.

Q: I understand.

A: Because this seemed significant.

Q: Well I guess what I'm asking you is, are you all—are you saying that you're

sitting there discussing evidence and what it means?

A: No, we're not. We're not. We're trying very hard not to.

Christeson then moved for a mistrial based on the alleged juror misconduct of discussing the facts of the case before all of the evidence was presented, and the court denied the motion.

■ A trial court's decision regarding juror misconduct will not be disturbed unless the court abused its discretion. *State v. Brown,* 998 S.W.2d 531, 540 (Mo. banc 1999), *cert. denied,* 528 U.S. 979, 120 S.Ct. 431, 145 L.Ed.2d 337 (1999). Although the colloquy, taken as a whole, allows for speculation that the jury was indeed discussing the evidence, the court was entitled to believe the juror's unequivocal assertions that the jury was not discussing the evidence. Even if the jury was curious about the windows of the Bronco, Christeson has not cited a single Missouri case holding that juror curiosity regarding an item of physical evidence, evidence that was indisputably in the defendant's possession, constitutes deliberation of the facts and juror misconduct. There was no abuse of discretion.

## D. Prosecutor's Improper Comments

■ Christeson claims that the trial court erred in overruling his objections, and in not declaring a mistrial *sua sponte,* when the prosecutor made eleven allegedly improper statements during the guilt phase closing argument. The only one of these allegations that was actually preserved for review was that the prosecutor argued contrary to the law when he said, "In order to find the defendant not guilty, you must believe him." On appeal, Christeson does not even attempt to show how this statement is contrary to the law, although at trial defense counsel explained that the determination of Christeson's

guilt or innocence must be based on all of the evidence, not merely on whether the jury believed his story. Regardless, the point has no merit. In context, the prosecutor was not making a statement about the law, but rather about his impression of the facts. The import of the statement was that only by believing defendant's far-fetched story could the jury arrive at a conclusion different than that supported by the overwhelming evidence of guilt. In context, the statement was not improper.

■ The remaining ten comments include: 1) "Well I think probably on the way over there they thought about what they were going to have to do;" 2) "One of the first things you consider is who has the most to lose. The defendant does. If he's convicted, we're going to go on with this trial and you already know I'm going to ask you for the death penalty. He has a great deal to lose and every reason to lie;" 3) "You know, there's an old saying in the law business that prosecutors like to give you the big picture and defendants like to nit-pick on details. I think that's what we are kind of seeing here;" 4) "On her daughter's bed? I find that incredible;" 5) "You know, there's an old story I heard one time about the four Gospels of the Bible. And all of them describe the crucifixion ... of Christ. And in one of those they tell you that there was a sign on the cross above Jesus' head that said, "Jesus Christ, King of the Jews." And there was another—in another one of the gospels it says the sign reads, "Jesus of the Jews." And in the third Gospel, it said, "Christ of the Jews." And the fourth Gospel doesn't mention the sign at all;" 6) "Folks, I guess what kind of bothers me the most when you look at this is let's examine what happened to Susan Brouk and her children;" 7) "You know, I guess, what bothers me was Susan Brouk was violated sexually;" 8) "She was violated sexually. I've heard

some people call rape murder of the human spirit;" 9) "What is the suggestion here, that Jesse Carter did this by himself? I don't know … can you imagine that that person would even come up with that idea? Not a nice man;" 10) "He believes that he can fool you."

■ Christeson argues that these statements were improper because the prosecutor injected his personal opinion, argued facts not based on the evidence, bolstered Carter's testimony, implied improper conduct by the defense, and/or inserted irrelevant considerations into the decision-making process. However, the record shows that most of these statements were reasonable inferences drawn from the evidence, or matters of common knowledge, or legitimate comments on the credibility of the defendant's case. A few comments were personalized, but only in a small, harmless way. The biblical references highlighted the fact that different accounts of an event may vary in the details while remaining consistent overall, and they were not improper for that limited purpose. *See State v. Debler,* 856 S.W.2d 641, 656 (Mo. banc 1993). Suffice it to say that none of the statements, even the few that could be considered improper, gave rise to manifest injustice that would warrant plain error relief. An extensive discussion of each of these claims of error would be of no precedential value. Rule 30.25(b).

## V. PENALTY PHASE

### A. Evidence of Prior Bad Acts

Christeson next claims that the trial court erred in admitting evidence that he sodomized Wagner, in instructing the jury on the matter, and in allowing the state to argue the evidence before the jury. Because none of these alleged errors were properly preserved, this Court will review only for manifest injustice under the plain

error rule. Rule 30.20. In any event, there were no errors in the first place.

■ Evidence of a defendant's prior unadjudicated criminal conduct is admissible during the penalty phase. *See State v. Ferguson,* 20 S.W.3d 485, 500 (Mo. banc 2000), *cert. denied,* 531 U.S. 1019, 121 S.Ct. 582, 148 L.Ed.2d 499 (2000); *State v. Winfield,* 5 S.W.3d 505, 515 (Mo. banc 1999), *cert. denied,* 528 U.S. 1130, 120 S.Ct. 967, 145 L.Ed.2d 838 (2000). "During the penalty phase, both the state and the defense may introduce any evidence pertaining to the defendant's character," *State v. Ervin,* 979 S.W.2d 149, 158 (Mo. banc 1998), *cert. denied,* 525 U.S. 1169, 119 S.Ct. 1090, 143 L.Ed.2d 91 (1999), including evidence of the defendant's conduct that occurred subsequent to the crime being adjudicated. *State v. Kenley,* 952 S.W.2d 250, 274 (Mo. banc 1997), *cert. denied,* 522 U.S. 1095, 118 S.Ct. 892, 139 L.Ed.2d 878 (1998). Therefore, the trial court did not commit error in admitting testimony that Christeson sodomized Wagner.

■ The alleged instructional error is based on the trial court's submission of Instructions No. 22, 25, and 28, patterned after MAI–CR 3d 313.41A. Christeson contends that these instructions permitted the jury to consider the penalty phase evidence of sodomy without guidance on how to consider the evidence or what weight to give it. However, as this Court has recently held, the instructions provide adequate guidance by correctly apprising the jury of the requirements of section 565.032.1, RSMo 1994, which authorizes the submission of so-called "non-statutory" aggravating circumstances. *Ervin,* 979 S.W.2d at 158–59. Nonetheless, Christeson relies on *State v. Debler,* 856 S.W.2d 641 (Mo. banc 1993), for the proposition that the jury should have been instructed regarding how to consider the evidence of

his prior unadjudicated bad acts, and what weight to give that evidence. *Debler* is not helpful to Christeson. This Court has explained that the error in *Debler* was lack of notice to the defendant, not lack of guidance to the jury. *Ervin*, 979 S.W.2d at 158. The trial court did not err in submitting the pattern instructions.

■ Finally, Christeson challenges the state's comment in closing argument that Christeson's conduct toward Wagner reveals a "predatory pattern," because he led Carter to commit murder and also coerced Wagner. However, this comment was a reasonable inference drawn from the evidence, so no error occurred.

### B. Testimony of Anna Boese

Christeson alleges that the trial court erred in admitting the testimony of Anna Boese because it duplicated and improperly bolstered that of Mike Wagner. As noted, Wagner testified that Christeson sodomized him when they were incarcerated together in the Vernon County jail. Christeson claims that Ms. Boese, Wagner's mother, "testified that her son had told her that [Christeson] had sodomized him." The actual testimony is as follows:

PROSECUTOR: ... At some point, did you notice some injury or sign of injury to [Wagner] after he got out of jail?
MS. BOESE: Yes.
Q: And when was this, if you remember?
A: The first time was two days—I believe two days.
Q: And what did you notice?
A: He had some rectal bleeding.
Q: And how was it you discovered this?
A: He told me.

■ As is apparent, contrary to Christeson's claim, Ms. Boese did not testify that Wagner told her that Christeson, or anybody, sodomized him, but that he told her about his physical condition. Improper bolstering occurs when an out-of-court statement is offered solely to corroborate or duplicate testimony. *State v. Wolfe*, 13 S.W.3d 248, 257 (Mo. banc 2000), *cert. denied*, 531 U.S. 845, 121 S.Ct. 114, 148 L.Ed.2d 70 (2000). Ms. Boese's testimony did not corroborate or duplicate Wagner's testimony that Christeson sodomized him.

### C. Prosecutor's Improper Comments

Christeson claims that the trial court erred in permitting the prosecutor to make eight allegedly improper comments during the penalty phase closing argument. The only preserved allegation of error with regard to these statements is that the prosecutor injected his personal opinion when he said, "Again, I tell you, this is the worst case in our society the worst crime in our society, murder in the first degree."

■ Christeson's argument is that this statement suggests that the state compared his case to others, and found it to be the worst, thus improperly crediting the state's opinion and admitting facts not before the jury. In context, however, this statement did not refer to Christeson's case in particular, but, rather, the statement was part of an argument that murder is the worst crime in our society and that that is why it is the only crime for which the death penalty is available. The trial court did not err in permitting the prosecutor to make this statement.

■ Christeson also requests plain error relief because of the following seven comments: 1) "You know, another thing that is that—I submit to you is tragic in this process is that the family farm you see along Highway 63 in this photograph no longer belongs to the Brouk family. The only little part of it is that section of trees where you see the arrow pointed to where

Susan Brouk lived.... You know, that is the only part of this family's history that's left of it. And it's marred by murder.... The impact on this family is—what little of the land they grew up on, their heritage, is marred;" 2) "I submit to you that your duty is to come back with that verdict on three counts;" 3) "... it is harder—hard as it may be for you, imagine how hard it might be for Judge Darnold if he has to make it alone;" 4) "I suggest to you that Jesse Carter would have done whatever Mark Christeson told him to do. He was 17 years old. His mental abilities, I think, were obvious;" 5) "A lot of people have come up rough. John Paul Jones, remember during the Revolutionary War, was an orphan. Yet, he was a famous military leader in the United States Navy. Abraham Lincoln lived in a one-room cabin, and he was President of the United States;" 6) "... coming up rough, even with a bad family situation, is not an excuse for murder. It does not temper murder or reduce its severity;" 7) "I'm sorry, folks, what you've heard about Mark Christeson isn't good enough."

Christeson contends that these statements were improper because they misstated the law, personalized the state's case, injected emotion into sentencing, diminished the jury's sense of responsibility, and/or argued facts outside of the evidence. However, the record shows that most of the challenged statements were either reasonable inferences drawn from the evidence or were based on matters of common knowledge. The other statements have been mischaracterized or taken out of context. There was no error, plain or otherwise.

### D. Statutory Aggravating Circumstances

■ Christeson contends that the trial court erred in submitting jury instructions patterned after MAI–CR 3d 313.40 because those instructions posited the same conduct as separate statutory aggravating circumstances, "thus allowing the jury to double- and triple-count that conduct in deciding whether to sentence [Christeson] to death." The instructions provided, consistent with section 565.032.2(2), that the jury was to determine whether the murder of each victim occurred during the commission of another unlawful homicide.

This Court has, time and again, considered and rejected similar arguments that the statutory aggravators are impermissibly duplicative. *See, e.g., State v. Ringo,* 30 S.W.3d 811, 824 (Mo. banc 2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1381, 149 L.Ed.2d 307 (2001); *State v. Johnson,* 22 S.W.3d 183, 191–92 (Mo. banc 2000), *cert. denied,* 531 U.S. 935, 121 S.Ct. 322, 148 L.Ed.2d 259 (2000); *State v. Worthington,* 8 S.W.3d 83, 87–88 (Mo. banc 1999), *cert. denied,* 529 U.S. 1116, 120 S.Ct. 1978, 146 L.Ed.2d 807 (2000); *State v. Barnett,* 980 S.W.2d 297, 309 (Mo. banc 1998), *cert. denied,* 525 U.S. 1161, 119 S.Ct. 1074, 143 L.Ed.2d 77 (1999); *State v. Shafer,* 969 S.W.2d 719, 740 (Mo. banc 1998), *cert. denied,* 525 U.S. 969, 119 S.Ct. 419, 142 L.Ed.2d 340 (1998); *State v. Morrow,* 968 S.W.2d 100, 116–17 (Mo. banc 1998), *cert. denied,* 525 U.S. 896, 119 S.Ct. 222, 142 L.Ed.2d 182 (1998).

### VI. INACCURATE TRANSCRIPT

■ Christeson alleges that the trial transcript is materially inaccurate and prevents this Court from undertaking meaningful appellate review so that the case must be remanded for a new trial. Appellants are entitled to a full and complete transcript for the appellate court's review, but they are entitled to relief only if they exercised due diligence to correct the deficiency in the record *and* they were prejudiced by the alleged defects. *Mid-*

*dleton*, 995 S.W.2d at 466. Under Rule 30.04(h), omissions and misstatements in the record may be corrected by stipulation of the parties or by an order of the appellate court directing that the defect be corrected. Here, Christeson attempted to correct alleged defects by requesting an order from this Court directing the court reporter to produce an accurate transcript. Thus, Christeson exercised due diligence in attempting to cure the defects. Nonetheless, he is not entitled to relief because, with the exception of one statement, discussed below, he has not identified the inaccuracies, and, in any event, he has not shown that he was prejudiced. Instead, he merely cites various lines on eighty pages dispersed throughout a transcript of more than 2,000 pages and alleges that a mistake occurred, without specifying what the mistake was or how it affects his appeal. He leaves this Court with the chore of pinpointing each alleged error and then discerning any prejudicial impact.

The majority of the alleged inaccuracies appears to be either typographical errors or witness or counsel misstatements. Typical of these are the following: "Could you volt for the death penalty"; "they'll surely give you an hour to eat and take a beak"; "[m]ay I please the court"; "summoned as protected jurors." Other errors are similarly trivial. On many of the pages Christeson cites, there are no errors at all. Because the errors that do appear are trivial or inconsequential, Christeson does not demonstrate the prejudice necessary to have an actionable claim. *See Middleton*, 995 S.W.2d at 466.

■ As to the statement that Christeson claims is "one of the most significant" errors, no prejudice could have resulted. That statement—made by defense counsel while instructing venirepersons about the death penalty—was: "if you're chosen to sit on this jury, at the time whatsoever will the Court through its instructions require you to give the death penalty...." Any potential prejudice was cured immediately when counsel, two sentences later, stated that "at no time would you ever be required to give the death penalty." In addition, the trial court itself instructed that "[t]he jury is never required to return a sentence of death."

## VII. INDEPENDENT REVIEW

■ Under section 565.035.3, RSMo 2000, this Court is required to determine whether:

(1) the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) the evidence supports the jury's finding of a statutory aggravating circumstance;

(3) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence, and the defendant.

Having thoroughly reviewed the record, this Court concludes that there is. no evidence to suggest that the punishment imposed was a product of passion, prejudice, or any other arbitrary factor.

Furthermore, this Court holds that the evidence amply supports the jury's findings on the aggravating circumstances that each murder was committed during the course of two other murders and that each involved depravity of mind because the killings exhibited a callous disregard for the sanctity of all human life. As noted, the record shows that Christeson raped Ms. Brouk and then bound her hands. When Ms. Brouk's daughter Adrian recognized Christeson's accomplice, Christeson decided to kill Ms. Brouk and her children. He took their personal property and vehicle and drove them to a pond where he cut

Ms. Brouk's throat and cut Kyle's throat. He suffocated Adrian and then threw Ms. Brouk, while she was still alive, onto the bodies of her two children where she drowned.

Finally, this Court concludes that the death sentences in this case are neither excessive nor disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence, and the defendant. Death sentences have often been upheld where the defendant murdered more than one victim. *See, e.g., State v. Smith,* 32 S.W.3d 532, 559 (Mo. banc 2000); *State v. Ringo,* 30 S.W.3d 811, 826 (Mo. banc 2000), *cert. denied,* — U.S. ——, 121 S.Ct. 1381, 149 L.Ed.2d 307 (2001); *State v. Johnson,* 22 S.W.3d 183, 192 (Mo. banc 2000), *cert. denied,* 531 U.S. 935, 121 S.Ct. 322, 148 L.Ed.2d 259 (2000); *State v. Wolfe,* 13 S.W.3d 248, 265 (Mo. banc 2000), *cert. denied,* 531 U.S. 845, 121 S.Ct. 114, 148 L.Ed.2d 70 (2000); *State v. Johnson,* 968 S.W.2d 123, 135 (Mo. banc 1998), *cert. denied,* 525 U.S. 935, 119 S.Ct. 348, 142 L.Ed.2d 287 (1997); *State v. Ramsey,* 864 S.W.2d 320, 327 (Mo. banc 1993), *cert. denied,* 511 U.S. 1078, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994). This Court has also upheld death sentences when the murder involved a callous disregard for the sanctity of all human life showing depravity of mind. *See e.g., Wolfe,* 13 S.W.3d at 265; *State v. Middleton,* 995 S.W.2d 443, 467 (Mo. banc 1999); *State v. Johnson,* 968 S.W.2d 123, 135 (Mo. banc 1998), *cert. denied,* 525 U.S. 935, 119 S.Ct. 348, 142 L.Ed.2d 287 (1998); *State v. Rousan,* 961 S.W.2d 831, 854 (Mo. banc 1998), *cert. denied,* 524 U.S. 961, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998); *State v. Carter,* 955 S.W.2d 548, 562 (Mo. banc 1997), *cert. denied,* 523 U.S. 1052, 118 S.Ct. 1374, 140 L.Ed.2d 522 (1998); *State v. Hall,* 955 S.W.2d 198, 211 (Mo. banc 1997), *cert. denied,* 523 U.S. 1053, 118 S.Ct. 1375, 140 L.Ed.2d 523 (1998). Taking into account the crime, the strength of the evidence, and the defendant, this Court determines that the death sentences in this case are proportionate to the death sentences imposed in similar cases.

The judgment is affirmed.

PRICE, C.J., WHITE, HOLSTEIN, WOLFF and BENTON, JJ., concur.

LAURA DENVIR STITH, J., not participating.