STATE of Missouri, Respondent,

v.

Terrance L. ANDERSON, Appellant.

No. SC 83680.

Supreme Court of Missouri,
En Banc.

May 14, 2002.

As Modified on Denial of Rehearing
June 25, 2002.

---

Janet M. Thompson, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Breck K. Burgess, Assistant Attorney General, Jefferson City, for Respondent.

RICHARD B. TEITELMAN, Judge.

A jury convicted Appellant, Terrance L. Anderson, of two counts of first degree murder for the homicides of Debbie Rainwater, for which Appellant was sentenced to death, and Stephen Rainwater, for which Appellant was sentenced to life without probation or parole. Because the trial court sentenced Appellant to death, this Court has exclusive appellate jurisdiction pursuant to Mo. Const. art. V, section 3. The judgment of the trial court is affirmed.

## I. BACKGROUND

### A. Factual Overview

The facts, which this Court reviews in the light most favorable to the verdict, are as follows:

In February of 1996 Appellant began dating Abbey Rainwater, a high school student in Poplar Bluff, Missouri, when she was 16 years old and he was 21. That summer, Abbey became pregnant with Appellant's child. Her parents, Stephen and Debbie Rainwater, then invited Appellant to live with them in their house. Appellant moved in with them, and then began neglecting his job with a local furniture company and staying out late at night. He was eventually discharged from his job in December 1996. That same month, Appellant grabbed Abbey by the neck and threw her against a wall. Abbey's parents asked him to move out, and he went to live with his mother.

Abbey's and Appellant's child, Kyra, was born on April 18, 1997, after which Appellant violently assaulted Abbey on two occasions. During the second of these assaults, Appellant told Abbey that if she told anyone about what he had done to her, he would kill everyone who lived with her, that he would make her watch him kill the baby, and that he would then kill her and himself.

The next morning, July 25, 1997, Abbey told her parents what had occurred, and then went to the courthouse and got a restraining order against Appellant. Later that day, Abbey spoke with Appellant by phone, notified him of the restraining order, and told him that he could not see her and that his visitation with the baby would be arranged through the court. Appellant then said he knew what he had to do now. Late that afternoon, Appellant went to the home of a friend and obtained a .357 caliber magnum handgun.

That night, Abbey was at home with two of her teenage friends, Stacy Turner and Amy Dorris. Also present in the home that night were Abbey's parents, her 10–year–old sister, Whitney, and Kyra.

Abbey, Stacy and Amy were downstairs when they heard knocking on the back door. One of the girls looked out of the small windows by the side of the door but did not see anyone. They then went upstairs and told Stephen Rainwater. He told them to go back downstairs to see if it happened again, while he looked out of an upstairs window. About a minute elapsed,

and someone knocked on the back door again, but Mr. Rainwater did not see anyone. He picked up a rifle and walked around the yard, but again saw no one. He came back in the house and placed the rifle in a corner of the master bedroom.

Stephen Rainwater then started driving around the neighborhood to see if he could find any suspicious vehicles or persons. Back home, the doorbell rang. Abbey, Stacy, Amy and Whitney went to the door and looked out of the small windows next to it. They saw Appellant standing outside the door holding a handgun. As the girls screamed and backed away from the door, Appellant then kicked in the door, splintering its frame. Debbie Rainwater told Abbey to run. Abbey and Whitney ran out the back of the house; Abbey ran to a neighbor's house and got the neighbor to call the police, while Whitney stopped fleeing shortly after she got outdoors. Stacy Turner stayed in the house, hiding in a bedroom closet. Amy Dorris stayed in the house near Debbie Rainwater.

Appellant approached Debbie Rainwater, who was standing beside a couch holding the baby. Appellant yelled at her and pointed the gun at her, telling her she was going to die. She got down on her knees and begged for her life. Appellant placed the gun against the back of her head, and fired it. The bullet killed her instantly.

Appellant then grabbed Amy Dorris, who had just witnessed the killing, went outside with her, and told her to yell for Abbey and the others to come out, but no one came out of hiding. While Appellant was in front of the house, Whitney, who had heard the gunshot, went back into the house and heard Kyra crying. She found her mother's dead body lying on top of the baby. She lifted her mother's body, picked up the baby, and attempted to hide with her in the house. Appellant found Whitney, however, and took Kyra from her. Appellant and Whitney then walked to the front yard, where Amy was still standing. Appellant, who was holding Kyra, pointed the gun at the baby's head and yelled that he would shoot the baby if Abbey did not come out.

Appellant saw Stephen Rainwater driving toward the house. Appellant took Kyra, Whitney and Amy around to the side of the house, so that Stephen Rainwater could not see them, and told them he would shoot them if they ran. Appellant, still holding Kyra, approached Stephen Rainwater and began talking to him. He then shot Stephen Rainwater in the forehead, killing him.

Appellant then went back inside the house and ordered Whitney to search for survivors. Whitney saw Stacy hiding in the master bedroom's bathroom, but did not tell Appellant.

Two officers from the Poplar Bluff police department arrived at the residence and saw Stephen Rainwater lying dead. They then saw Appellant, who was in Abbey's bedroom, open a window. Appellant held the baby in front of him as a human shield, waved the handgun in the direction of the officers, and yelled at them to put down their guns. The officers told Appellant to put down his weapon, which he refused to do, repeatedly yelling at them to drop their weapons.

After other officers arrived and surrounded the house, Appellant eventually came out of the house without the handgun he had been brandishing and surrendered. Appellant was placed under arrest and taken into custody.

## B. Trial Proceedings

Prior to trial, the trial court heard evidence regarding Appellant's mental competency to stand trial. The court found that Appellant was competent to proceed.

The case was tried in Cape Girardeau County on a change of venue from Butler County. Appellant did not testify in his own behalf. His defense at trial rested primarily on the theory that he lacked sufficient mental capacity to deliberate at the time of the killings. Appellant presented the testimony of Dr. Jonathan Pincus, a neurologist, who stated that Appellant could not deliberate because he had suffered brain damage at birth. He also presented the testimony of Dr. Dorothy Lewis, a psychiatrist. She testified that Appellant could not deliberate on the day of the murders because he was suffering at that time from a combination of severe depression and extreme paranoia. In rebuttal, the State presented the testimony of Dr. Byron English, a psychologist and forensic examiner with the Department of Mental Health. He testified that his testing and examination indicated that Appellant had an IQ of 84, and that he did not have a mental disease or defect that made him unable to deliberate.

The jury found Appellant guilty on both counts of murder in the first degree, and the case then proceeded to the penalty phase. The State presented the victims' daughters, who testified about the victims, and Appellant presented the testimony of five witnesses in an attempt to mitigate punishment.

At the close of evidence, instructions and argument in the penalty phase, the jury recommended that Appellant be sentenced to death for the murder of Debbie Rainwater, and sentenced to life without possibility of probation or parole for the murder of Stephen Rainwater. With respect to the murder of Debbie Rainwater, the jury found the following three statutory aggravating circumstances: (1) that the

murder occurred while Appellant was engaged in the commission of another unlawful homicide; (2) that by his act of murder Appellant had knowingly created a great risk of death to more than one person by means of a weapon that would normally be hazardous to the lives of more than one person; and (3) that the murder was outrageously or wantonly vile, horrible or inhuman because it involved depravity of mind in that Appellant killed Debbie Rainwater as part of a plan to kill more than one person, and thereby exhibited a callous disregard for the sanctity of all human life.[1]

The court imposed the sentences recommended by the jury. This appeal follows.

## II. JURY SELECTION PROCEDURES

Appellant's first point challenges the jury selection procedures employed in Cape Girardeau County and used in his case. Specifically, Appellant contends the trial court erred in denying his motion to dismiss or to preclude the State from seeking the death penalty, wherein he alleged that African–Americans were being systematically excluded from the venire panel in violation of his constitutional rights to equal protection and to a jury selected from a venire panel representative of a fair cross-section of the community. He further argues that the Cape Girardeau County board of jury commissioners (hereinafter, "Board") failed to substantially comply with relevant requirements of sections 494.400–.505 RSMo 2000, in that they allegedly (a) relied on a master jury list containing less than the statutorily required 5% of the county's population, and (b) allowed the circuit court clerk and pre-

---

1. See section 565.032.2(2), (3) and (7), RSMo 2000. All further statutory references are to RSMo 2000 unless otherwise noted.

siding judge to release venirepersons for improper or inadequate reasons.

## A. Fair Cross–Section Claim

■ The Sixth Amendment requires that juries be selected from venires that represent a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 526, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). That requirement is essential to fulfill the Sixth Amendment's guarantee of an impartial jury in criminal trials. *Id.* "To establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group within the community, (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) that this under-representation is due to systematic exclusion of the group in the jury selection process." *State v. Kinder*, 942 S.W.2d 313, 337 (Mo. banc 1996). "To demonstrate systematic exclusion, a defendant must prove unfair under-representation of the excluded group on his venire and in general on other venires in the relevant judicial system near the time of his trial." *Singleton v. Lockhart*, 871 F.2d 1395, 1398 (8th Cir.1989).

■ In this case, the record does not support Appellant's claim that he was denied his right to a jury selected from a fair cross-section of the community. The record shows that while approximately 4.5% of the population of Cape Girardeau County are African–American, approximately 5.2% (7 out of 133) of the venirepersons who appeared in Appellant's case were African–American.

## B. Statutory Compliance Claims

### 1. Size of Master Jury List

Appellant also argues that the Board violated section 494.410.1 because the master jury list contained only 750 names at any given time, far fewer than the statutorily required 5% of the county population.[2]

The record does not support this claim. Instead, it shows that the Board compiled a master jury list of about 42,000 names, greatly exceeding the required minimum 5% of the county population. This master jury list was compiled from, and consisted of, a combined cross-referenced list of the eligible voters and licensed drivers within Cape Girardeau County. Once every three months the Board would load the names from the master jury list into a computer, which would then randomly select a "qualified juror list" of 750 names, consistent with section 494.415. Separate jury panels would then be chosen from the qualified jury list as needed.

■ Appellant's argument on this issue is based in part on a matter of semantics contained in the testimony of the Cape Girardeau County circuit clerk, who at times used the term "source lists" rather than "master jury list" to refer to the combined and cross-referenced registered voters/licensed drivers list. It is clear from the overall context of the clerk's testimony, however, that he was using these two terms interchangeably. See also the 1993 Committee Note to Standard 2, Supreme Court of Missouri "Standards Re-

---

**2.** Section 494.410.1 requires that the Board compile a master jury list of potential jurors and their addresses, updating the list periodically. It states, in pertinent part:

> The master jury list shall be comprised of not less than five percent of the total popu-

lation of the county ... as determined from the last decennial census. In no event shall the master jury list contain less than four hundred names.... The master jury list shall be the result of random selection of names from public records.

lating to Juror Use and Management" (advisory standards adopted by this Court for guidance and use by all Missouri courts, which may be obtained from the Office of State Courts Administrator). The Committee Note states that, in compiling the master jury list: "Using two source lists, such as the drivers license and voter registration lists, is recommended." Appellant is incorrect in arguing that simply because section 494.410 requires the Board to "consult" one or more public records (such as the voter registration and drivers license lists) in order to compile the master jury list, that the master jury list therefore cannot *consist of* those records. *See State v. Albrecht,* 817 S.W.2d 619, 623 (Mo.App. 1991).

### 2. Alleged Improper or Inadequate Reasons for Excluding Some Venirepersons

Appellant also complains that the circuit clerk and presiding judge would routinely remove names from the 750–person qualified juror lists for "improper or inadequate reasons." He argues that the circuit clerk would improperly remove people known to be ill, or who had a doctor's appointment, or who were believed to be out of town or working on the Mississippi River for extended periods of time, or who "for any number of reasons cannot serve during that term."

██ Review of the record shows little support for this claim. Instead, it shows

that the clerk typically removed only the names of people who were statutorily ineligible for service under section 494.425 due to factors such as age, nonresidency, felony convictions, or being a licensed attorney. Each potential juror received a summons, a questionnaire and a letter from the court. If the questionnaire was returned with reasons why a person should be excused from service due to a hardship listed in section 494.430, the presiding judge then made a determination as to whether the individual should be excused.[3] The trial court only excused people eligible to be excused.

Appellant nonetheless contends the evidence shows that, in some instances, the clerk not only removed people who were statutorily ineligible, but also some who were not, such as individuals known to be gone on an extended vacation or working for extended periods of time on the river.

██ To the extent that the record may arguably support this contention, no *substantial* failure to comply with the underlying statutory policy and provisions embodied by Chapter 494 occurred in Appellant's case. Only a "substantial" failure to comply with the statutory jury selection requirements would entitle Appellant to relief. *Section 494.465.1.* In this context, we hold that a "substantial" failure to comply is one that either rises to the level of a constitutional violation, and/or that actually prejudices a defendant.[4] For reasons

---

**3.** The lone exception for this pertained to medical reasons, which were permitted as an excuse under section 494.430(4). The standing policy, instituted by the presiding judge, was that the circuit clerk was to excuse a person from service for medical reasons if that person had submitted a statement from a doctor indicating that he or she was unable to serve. However, the clerk could refer the medical excuse to the presiding judge for review.

**4.** In rare cases, certain violations of the statutory jury selection requirements may be so fundamental or systemic in nature as to amount to a "substantial" failure to comply with the statutes, thereby entitling a defendant to relief, even in the absence of a clear showing of actual prejudice or of a constitutional violation. *See State v. Gresham,* 637 S.W.2d 20, 26 (Mo. banc 1982). No such violations occurred in this case.

already discussed, the jury selection procedures employed in Appellant's case did not violate his constitutional rights. As to prejudice, Appellant has not shown that any individual was actually improperly excused in his case. By the same token, Appellant also has not shown that he was in any way prejudiced by some isolated and minor technical violations that might possibly have occurred if the clerk, for example, removed some venirepersons who were thought to be away on vacation. The exclusion of a prospective juror for reasons not listed in the statute is not grounds for reversal absent a showing that a defendant was actually prejudiced by failure to strictly observe the statutory provisions for excuse. *State v. Gilmore,* 661 S.W.2d 519, 523 (Mo. banc 1983); *see also State v. Cross,* 887 S.W.2d 789, 791–92 (Mo.App. 1994).

## III. COMPETENCY

Appellant complains of three errors relating to the trial court's determination of competency. He contends that the trial court erred in failing to hold a competency hearing "when counsel first questioned [Appellant's] competency," erred in ruling that Appellant was competent to stand trial, and erred in denying his *ex parte* motion to be transported to St. Louis for additional mental testing.

### A. Timing and Sufficiency of Pre–Trial Hearing

 The trial court is required to initiate proceedings to investigate the competency of a defendant "whenever a reasonable judge in the same situation as the trial judge would experience doubt about the defendant's competency to stand trial." *State v. Johns,* 34 S.W.3d 93, 104 (Mo. banc 2000); *see also section 552.020.2.*

The record shows that that was done in this case. The trial court ordered two mental examinations of Appellant, the first of which was ordered only 12 days after Appellant filed a motion alleging he was incompetent.

Subsequently, the trial court held a pre-trial hearing on the issue of Appellant's competency. Appellant did not present any witnesses at the hearing, but asked for the court to decide the issue based on the reports of Dr. English that had been formally filed with the court, and on the reports and other matters from Dr. Pincus and Dr. Lewis that had been previously submitted to the court but not formally filed. *See section 552.020.7.* After reviewing the evidence that was presented, the trial court ruled that Appellant was competent to proceed with trial.[5] The trial court followed the procedures required by section 552.020, and provided Appellant with a timely and adequate opportunity to present the issue of his alleged incompetence.

### B. Finding of Competency

 It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the prosecution of a defendant who is not competent to stand trial. *State v. Johns,* 34 S.W.3d at 104 (citing *Medina v. California,* 505 U.S. 437, 439, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992)). A defendant is competent when he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has 'a rational as well as factual understanding of the proceedings against him.'" *Johns,* 34 S.W.3d at 104 (citing and quoting *Godinez v. Moran,* 509 U.S. 389, 396, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993)). In Missouri a defendant is presumed competent,

---

**5.** The trial court held a second evidentiary hearing on Appellant's competency, post-trial and prior to sentencing, and again determined that Appellant was competent.

and has the burden of proving incompetence by a preponderance of the evidence. *Section 552.020.8.*

██ Dr. English, the court-appointed expert, testified for the State. He indicated, *inter alia,* that Appellant had a full-scale IQ of 84, which was in the normal range of intelligence; that he found no indication of brain damage; that Appellant had some paranoid tendencies in his thinking but exhibited no pathological paranoia or delusional thinking; that he was able to answer questions in a rational, reality-based and goal-directed manner; and that he understood the charges he faced, the potential sentences or commitment, as well as the criminal trial process and roles of the various parties in it. Dr. English concluded that Appellant had the capacity to understand the proceedings against him and to assist in his defense. The trial defense experts, Drs. Lewis and Pincus, presented a considerably different assessment of Appellant. They testified, *inter alia,* that Appellant suffered some brain damage at birth, and that he also was delusional, suffered from major depression, was extremely paranoid in his thinking, and was so suspicious and distrustful of his lawyers that he was not able to effectively cooperate with them or assist in his own defense.

██ However, a mere disagreement among experts does not necessarily indicate error on the part of the trial court. *State v. Johns,* 34 S.W.3d at 105. On the contrary, it is the duty of the trial court to determine which evidence is more credible and persuasive. *Id.* That is what occurred in this case. Near the conclusion of the pre-trial competency hearing, although initially expressing some reluctance to decide the matter, the trial court stated: "We have an expert for the State that says one thing that's opposed by two experts for the defense. It's a factual question as far as

I'm concerned." The court then found that Appellant was competent to stand trial.

██ The trial court's determination of competency is one of fact, and must stand unless there is no substantial evidence to support it. *State v. Petty,* 856 S.W.2d 351, 353 (Mo.App.1993). In assessing sufficiency of evidence, this Court does not independently weigh the evidence, but accepts as true all evidence and reasonable inferences that tend to support the trial court's finding. *State v. Johns,* 34 S.W.3d at 105. We find that Dr. English's testimony presented adequate substantial evidence to support the trial court's finding that Appellant had sufficient ability to understand the proceedings against him and to assist in his defense.

### C. Denial of Pre–Trial Motion to Transport for Additional Testing

██ In September of 1998, Appellant filed under seal an "Ex Parte Motion To Transport Defendant For Examinations," which requested that he be secretly (that is, unbeknownst to the prosecution) transported to Barnes Hospital in St. Louis for a battery of mental and neurological tests. Appellant contends on appeal that the trial court erred and abused its discretion in denying this motion. According to Appellant, its denial "stymied" his defense at trial, because as a result thereof his experts were unable to "definitively determine whether Appellant had neurological damage and was mentally ill" and were not sufficiently able "to respond to the State's claims that his experts' opinions were inaccurate."

██ We disagree. Appellant's *ex parte* motion was filed in violation of Rule 20.04, which requires service to opposing counsel of motions like this. The motion

could properly be denied on that ground alone. Normally, a defendant is not entitled to an *ex parte* hearing on such a matter. *See State v. Tokar*, 918 S.W.2d 753, 765 (Mo. banc 1996). Moreover, Appellant's motion was filed *before* any proceedings had been initiated or requested pursuant to section 552.020, and Appellant failed to plead any specific facts in support of his motion showing that his mental capacity was seriously at issue at that time or that the requested testing was necessary to his defense. *See Guinan v. Armontrout*, 909 F.2d 1224, 1227 (8th Cir. 1990) (holding that defendant must plead and prove facts demonstrating a reasonable probability that the requested tests would aid in his defense and that denial of the tests "would result in an unfair trial.") Finally, we note once proper proceedings to investigate Appellant's competency were initiated under section 552.020 in March of 1999, Appellant never, prior to being convicted, renewed his earlier request to be transported to St. Louis for additional testing notwithstanding the fact that he was extensively tested and examined by two defense experts, who presumably could have expressed the need for such additional tests if one existed. The trial court did not err or abuse its discretion in denying Appellant's *ex parte* motion.

## IV. STRIKING VENIREPERSONS IRWIN AND LIGHT

Appellant next argues that the trial court erred in striking venirepersons Thelma Irwin and Lori Light for cause over his objection and at the State's request. According to Appellant, although both individuals initially gave responses indicating they were not qualified to sit on a death-penalty case, the trial court should have found they were qualified in light of their later contradictory responses.

▆▆▆▆ "While a trial court cannot exclude a juror from a capital punishment case simply because of a conscientious objection to the death penalty, a juror may be excluded if his views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *State v. Clemons*, 946 S.W.2d 206, 225 (Mo. banc 1997). A venireperson is not qualified to sit in a death-penalty case if it appears that he or she cannot consider the entire range of punishment, apply the proper burden of proof, or otherwise follow the court's instructions. *State v. Clayton*, 995 S.W.2d 468, 475–476 (Mo. banc 1999). The trial court is in the best position to evaluate a venireperson's qualifications to serve as a juror and has broad discretion in making the evaluation. *State v. Christeson*, 50 S.W.3d 251, 264 (Mo. banc 2001). A trial court's ruling on a challenge for cause will not be disturbed on appeal unless it clearly is against the weight of evidence and is a clear abuse of discretion. *Id.*

### A. Venireperson Irwin

▆▆▆ When first questioned by the prosecutor regarding her ability to impose the death penalty, venireperson Irwin gave answers strongly suggesting that she would be unable to do so, due to her experience as a nurse. The following exchange occurred:

PROSECUTOR: Could you vote for the other alternative of death?

VENIREPERSON IRWIN: I don't know. I've been a nurse for 48 years saving lives, and I just don't know if I could do that.

Q. I understand. Do you understand, however, I'm obligated to put you on the spot and try to get you to give me a yes or no answer?

A. I know.

Q. Would it help you to think about it a bit before I ask you more questions, or do you think—Well, the question, I suppose, that I've asked the other ladies is, you know, I have to prove the defendant guilty beyond a reasonable doubt, and if we get to the second part of the trial, there are other matters which I have to prove beyond a reasonable doubt. You obviously have reservations about the death penalty that you do not have about the other alternative of life without parole. Are you telling me that you're going to want proof that is in excess of proof beyond a reasonable doubt before you could consider and vote for the death penalty?

A. I don't know. I just don't know if I could then or not. I just don't know how to answer it. I don't. know if I could or not.

The prosecutor questioned other venirepersons, but then returned to Ms. Irwin. In the following exchange, venireperson Irwin indicated she could not sign a death verdict:

PROSECUTOR: I understand, Ms. Irwin, you were very uncertain. Now we're going to put you on the spot. You know I was coming back to you. Could you sign a death verdict?

VENIREPERSON IRWIN: No, I could not do that.

Q. I take it that that is something that would not be, that has no bearing on what the evidence is. You just can't sign it no matter what the evidence might be?

A. Right.

Later, without any specific mention of the death penalty, defense counsel elicited from Ms. Irwin that she would try to set aside her views and follow the law she was "uncomfortable" with:

DEFENSE COUNSEL: Now, understanding—Under the law, I think it's almost universal that there's always laws out there that if you choose any person, there will probably be some law that they don't agree with or some law that they're uncomfortable with, and that's almost a universal feeling; but if you were to sit on this jury, could you set aside your personal views and follow the law and obey the law as given to you by His Honor ... and set aside your personal views if you're selected to serve on this jury?

VENIREPERSON IRWIN: I would have to.

Q. And you would be willing to do that?

A. Yes.

Q. And assuming you were sitting on, one of the final 12 who sat on this jury and your fellow jurors felt so much of you that they selected you as the foreperson, would you follow your duties as a foreperson even though you felt uncomfortable doing so?

A. Yes.

Q. And you would be willing to set aside your personal would you be able to set aside your personal views and fulfill your duties as foreperson if selected?

A. I would try very hard. I would have to.

The trial court then sustained the prosecutor's motion to strike venireperson Irwin for cause.

█ When faced with contradictory responses from a venireperson regarding his or her qualifications to serve on a jury, a trial court does not abuse its discretion by giving more weight to one response than the other and in finding that the venireperson could not properly consider the death penalty. *State v. Kinder,* 942 S.W.2d at 324–325. Here, the court did not abuse its

broad discretion in determining that venireperson Irwin's most credible answers were the ones that indicated she was not able to impose the death penalty, and that her answers "on the whole were equivocal and, hence, disqualifying." *State v. Christeson*, 50 S.W.3d at 265; *see also State v. Winfield*, 5 S.W.3d 505, 510–511 (Mo. banc 1999) (finding no abuse of discretion where venireperson indicated she could not impose death penalty because she had been nurse for many years, then later stated that she could consider death penalty, and trial court struck her for cause because it believed her first response rather than her second).

### B. Venireperson Light

■ The situation is similar with regard to venireperson Lori Light, and no jurisprudential purpose would be served by a detailed recitation of her voir dire responses. Suffice to say that under examination from the prosecutor, venireperson Light stated that she did not know whether she could impose the death penalty, that she probably could not sign a death verdict, that because of her discomfort with the death penalty she would want the State to prove Appellant's guilt by evidence greater than proof beyond a reasonable doubt, and that she probably could not follow the instructions of the court in this type of case. Defense counsel then was able to get Ms. Light to state that she would be able to convict based on proof beyond a reasonable doubt, and that she could fairly consider either punishment. However, she never stated that she could sign a death verdict or that she could actually recommend the death penalty. The prosecutor then moved to strike for cause. In granting the motion, the trial court stated, in part: "There was an awful lot of body language that goes into these responses, and frankly, Ms. Light is not

someone, I think, who can sit on this particular jury."

Here again, the trial court was acting within its broad discretion in evaluating Ms. Light's overall responses and demeanor and was entitled to believe that her first responses, indicating that she was not qualified to be a juror in a death penalty case, were a more accurate reflection of her true views; it was not required to believe her later partially contradictory responses. *See State v. Kinder*, 942 S.W.2d at 324–25.

## V. ALLEGED IMPROPER USE OF BILLING RECORDS

Appellant further contends the trial court erred in allowing the State to use allegedly confidential billing records, obtained from the state Office of Administration, concerning payments made by the state Public Defender's Office to defense expert Dr. Lewis for her work in this and other cases. Specifically, Appellant claims the court erred in: (1) allowing the prosecution to use this information to impeach Dr. Lewis in her videotaped deposition that was shown to the jury; (2) allowing the State to argue during closing argument that Dr. Lewis was biased because she had a financial interest in coming to a conclusion favorable to Appellant; and (3) quashing Appellant's post-trial subpoenas to the prosecutor and his investigator aimed at discovering exactly how the prosecution had obtained the billing records in question.

### A. Relevant Background Facts

As a state agency, the Public Defender's Office submits various billing requests, including expert witness fees, to the state Office of Administration. At some point prior to trial, the prosecution obtained records from the Office of Administration concerning fees paid by the Public Defender's

Office to Dr. Lewis for her work in this and other criminal cases. At the deposition of Dr. Lewis taken about one month before trial, the prosecutor used these records in cross-examining her. In her responses to this portion of cross-examination, Dr. Lewis indicated, *inter alia,* that she had billed the Public Defender approximately $38,000 up to that point in Appellant's case. She further indicated that, from early 1998 through March of 2000, the Public Defender's Office had paid her a total of approximately $142,000 for her work in this and other cases.

A few days before trial, Appellant filed a "Motion to Preclude Use of Confidential Public Billing Records," arguing that the prosecutor had illegally accessed the billing records in question, in that the records must be treated as confidential under a proper statutory construction of either sections 600.091 or 610.021(1). The trial court took the motion with the case. Before Dr. Lewis's deposition was played to the jury, Appellant again objected to the method by which the State obtained the billing records and any mention of them to the jury. The prosecutor argued that the records in question were public records. The trial court then admitted the video of Dr. Lewis's deposition and a transcript of it (Defendant's Exhibits E and D), though not the billing records themselves.

Later, during the guilt-phase closing argument, the prosecutor argued—without objection—that Dr. Lewis was biased and not credible because she had a vested interest of about $70,000 a year due to her monetary relationship with the Public Defender's Office. After trial, defense counsel subpoenaed the prosecutor and his investigator in an attempt to depose them as to how the billing records had been obtained. The prosecutor filed a motion to quash the subpoenas, which the trial court granted.

### B. Use of the Billing Records

In resolving this question, it is not necessary to address the parties' myriad statutory arguments concerning whether and to what extent the billing records themselves, maintained by the Office of Administration, should be treated as confidential rather than public records. Rather, we note that it is beyond dispute that the substantive evidence concerning what Dr. Lewis was paid in this case and other cases involving the Public Defender's Office would be discoverable under normal methods, and that such information was clearly relevant and admissible to show bias. *See State v. Love,* 963 S.W.2d 236, 242–244 (Mo.App.1997) (defense expert impeached with her earnings in that case and other cases where she worked for Public Defender's Office); *see also State ex rel. Lichtor v. Clark,* 845 S.W.2d 55, 65–67 (Mo.App.1992). Indeed, the pecuniary interest, bias or prejudice of a witness may always be shown. *State v. Long,* 698 S.W.2d 898, 901 (Mo.App.1985). Moreover, in the present case the trial court specifically found that it would have ordered disclosure of the impeaching evidence if it had been requested to do so.

On direct appeal, we review the trial court "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Morrow,* 968 S.W.2d 100, 106 (Mo. banc 1998). Appellant cannot plausibly claim that he was significantly prejudiced by the prosecutor's use of information that was both properly discoverable and clearly admissible.

### C. Comment During Closing Argument

Appellant also claims the trial court erred in allowing the prosecutor to argue pecuniary bias on the part of Dr.

Lewis during closing argument. Since no objection was made at trial, this claim has not been preserved for review. We have reviewed for plain error, and find none.

### D. Quashing Subpoenas for Post–Trial Depositions

Appellant further contends the trial court erred by quashing his post-trial subpoenas of the prosecutor and prosecutor's investigator, refusing to allow them to be deposed on the matter of how the State obtained the billing records from the Office of Administration.

■ There is no merit in this claim. The right to take depositions "is subject to the power of the trial court to issue protective orders to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including an order that discovery not be had." *State ex rel. Chaney v. Franklin,* 941 S.W.2d 790, 792–793 (Mo.App.1997). Any attempt to depose an opposing counsel calls for special scrutiny because "such depositions inherently constitute an invitation to harass the attorney and parties . . . ." *Id.* at 793.

■ Here, the question of exactly how the State obtained the records from the Office of Administration is of no particular significance; and Appellant has failed to show that the requested post-trial depositions of the prosecutor and his investigator could have revealed any new information that was necessary for his case, or could have changed the outcome of the case. Nor does Appellant attempt to explain why he waited until *after* trial to seek to depose the prosecutor and his investigator on this matter, even though he knew about the issue well before trial occurred. The trial court did not err by quashing Appellant's subpoenas and refusing to allow him to conduct the requested post-trial depositions.

### VI. CLOSING ARGUMENTS

In his next point, Appellant lists seven instances during the guilt-phase closing argument and five instances during the penalty-phase closing argument in which he claims the prosecutor made remarks that were improper and prejudicial. None of these twelve claims were preserved for appeal by an objection at trial. Appellant argues, nonetheless, that in each instance the trial court committed plain error by failing to intervene *sua sponte* and declare a mistrial.

The complained of comments include the following remarks made by the prosecutor during the guilt-phase closing argument: (1) that "I'm sure the defense will argue to you [Appellant]is not guilty of anything because they're challenging whether he knew what he was doing was practically certain to cause death;" (2) that "the only thing that is surprising in this incident is that the body count isn't any higher than it is. If he had more time, I think we would have had a lot more dead people there. But we got lucky;" (3) that in order to find as the Appellant asked them to find, the jury would "have to believe the hired mercenaries from the East Coast." And "the idea that he has a mental disease is nonsense. Remember who you have to believe in order to find that one exists: the highly paid experts in the employ of the Public Defender's Office;" (4) "At least they admit it's second-degree murder. So, I suppose the instructions indicating he didn't know what he was doing are something they don't believe you should consider too carefully;" (5) (in response to the Appellant's closing argument, wherein defense counsel stated Appellant was not using the baby as a human shield when he came out to surrender but instead had been holding the baby and properly supporting the baby's head), that "He didn't

support that baby's head, at least not good enough the way I was taught;" (6) that "one of the things that irritated me when I was listening was this reference to [Appellant]being broken;" and (7) that "as I've said once before, the only surprise here is that we don't have more bodies on the floor than we did."

Additionally, the complained of comments include the following remarks made by the prosecutor during the penalty-phase closing argument: (8) that "twelve of you have been asked to make this decision, and that will be hard for the twelve of you, but if you can't make it, it falls to one man, the judge in this case, and as hard as it is for you, let's not lay it on a single man's shoulders;" (9) that "one of the biggest factors you have to consider is what is the best way to protect society as a whole, and I submit to you that the best way to protect society as a whole is to place that man where he can do no more harm. That is on death row until he is executed. Put him beyond the ability to harm anyone else;" (10) (in response to Appellant's closing argument, in which defense counsel stated that life imprisonment would be similar to "locking yourself in your bathroom and never leaving for the rest of your life"), that "[Appellant] is not going to spend the rest of his life in your bathroom. He's going to be in a jail cell out of which he is allowed to go on many occasions. He is going to have repeated and daily contact with other prisoners and guards. What happens if he gets mad at one of them? The most restrictive environment possible and the safest with one we fear may do this again is death row until he is executed;" (11) that "I know those in my generation at 21 and 22 were wearing the same color clothes to work every day and leading men into a lot of situations, including combat;" and (12) that "as a much smarter man than I once said, the only thing that is necessary for evil to triumph is for good men, and I suggest good women, to do nothing. I suggest to you that you dare not do nothing."

 Allegedly improper comments made by the prosecutor during closing argument that are not preserved for review by a timely objection can be reviewed only for plain error under Rule 30.20. *State v. Christeson*, 50 S.W.3d at 265. To reverse a conviction under plain error review on a claim of improper closing argument, a defendant must establish not only that the argument was improper, but that it had a decisive effect on the outcome of the trial and would amount to a manifest injustice or miscarriage of justice if the error were left uncorrected. *State v. Lyons*, 951 S.W.2d 584, 596 (Mo. banc 1997). Statements made in closing argument will only rarely amount to plain error. *State v. Clayton*, 995 S.W.2d 468, 478 (Mo. banc 1999). With respect to Appellant's twelve claims of error concerning closing argument for which no objection was offered at trial, we find no error of law. An extended discussion of these contentions would serve no jurisprudential or precedential purpose. *Rule 30.25(b)*.

 Lastly, as to closing argument during the penalty phase, Appellant also contends the trial court erred when it overruled his objection after the prosecutor argued: "But have you been watching the defendant here? Have you seen a tear for Stephen or Deborah Rainwater?"[6] Appellant maintains that this remark im-

---

**6.** Although objected to at trial, this claim as well is not preserved for review, since Appellant did not raise it in his motion for new trial. Additionally, the objection to this remark at trial merely stated that it was im-proper to comment on Appellant's demeanor. Appellant now argues—for the first time on appeal—that the remark also amounted to an improper comment on his failure to testify.

properly commented on his failure to testify. However, in the overall context of the closing argument, the prosecutor's remark was not a direct or an indirect comment on Appellant's failure to take the witness stand and testify; rather, it was a comment about his apparent lack of remorse as he sat in the courtroom. Generally, a prosecutor may comment during the punishment phase on the lack of evidence of a defendant's remorse, to show the nature of his character. *State v. Tokar*, 918 S.W.2d at 769. The trial court did not plainly err when it overruled Appellant's objection and motion for mistrial on this point.

## VII. ALLEGED IMPROPER COMMENTS ON POST-ARREST SILENCE

Appellant next contends that the trial court erred by overruling a general objection at one point, and by failing to declare a mistrial *sua sponte* at a later point, when the prosecutor elicited from two police officers allegedly improper comments on Appellant's exercise of his right to remain silent.

In the trial's guilt phase, the State called Officer Paul Clark, who was one of the first officers to arrive at the crime scene. During Officer Clark's direct examination, the following exchange occurred:

Q. After you got [Appellant] to the car, what did you do?

A. We patted him down, checked his pockets and everything that he had on him, and I advised him of his constitutional rights.

Q. Did you have a conversation with him then?

A. No.

Q. During the time that you were with him, how was he acting?

A. He was just hot and all sweaty.

Q. Did he say anything?

DEFENSE COUNSEL: Objection.

A. No.

THE COURT: Overruled.

Q. Did he appear to be calm?

A. Yes.

In the penalty phase of the trial, Appellant called Officer Ralph Jefferson as a witness. During cross-examination, the State asked Officer Jefferson how Appellant was acting when he was brought to the police station. Jefferson answered: "Solemn. He wasn't saying anything. He didn't appear to be angry. He really did not have much of an expression on his face." Defense counsel did not object to this testimony.

According to Appellant, each of these two separate instances of testimony, by Officers Clark and Jefferson, "highlighted" for the jury the fact that Appellant elected to remain silent after being read his *Miranda*[7] rights, and amounted to the State impermissibly using his silence against him. Appellant acknowledges that neither claim has been preserved for appeal,[8] and thus requests plain error review. Appellant argues that in both instances the trial court should have granted a mistrial on its own motion.

It is true, as Appellant notes, that if a defendant chooses to remain silent upon arrest and after receiving *Miranda* warnings, it is a fundamental violation of

---

7. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

8. With respect to Officer Jefferson's testimony, the claim is not preserved because there was no objection to it at trial. With respect

to Officer Clark's testimony, the only objection offered was simply the word "Objection." Such a non-specific objection preserves nothing for review. *See State v. Morrow*, 968 S.W.2d 100, 118 (Mo. banc 1998).

his constitutional rights for the State to use that silence against him. *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). However, while it is improper to use a defendant's post-arrest post-*Miranda* silence "either as affirmative proof of a defendant's guilt or to impeach his testimony," *State v. Howell*, 838 S.W.2d 158, 161 (Mo.App.1992), a defendant's silence can be mentioned if it is not used for either of those purposes. *State v. Mathenia*, 702 S.W.2d 840, 842 (Mo. banc 1986). Indeed, many cases have held that evidence similar to the challenged testimony in the instant case is admissible, because no reasonable inference of guilt can be drawn merely from the fact that a defendant was informed of his rights and then exercised them when he was not being questioned at the time he invoked his rights. *See State v. Johnson*, 943 S.W.2d 837, 839–841 (Mo.App.1997); *Howell*, 838 S.W.2d at 160–163; *State v. Green*, 798 S.W.2d 498, 501–503 (Mo.App.1990).[9]

Such is the case here. The disputed testimony consists of two brief and isolated references showing merely that Appellant was not questioned about the murders by either Officers Clark or Jefferson, and never made statements to them about it. The record shows this evidence was not used by the State either to impeach Appellant's testimony or as affirmative evidence of his guilt. Accordingly, the trial court did not err, plainly or otherwise, in failing to grant a mistrial on its own motion.

## VIII. ALLEGED INSTRUCTIONAL ERROR REGARDING STATUTORY AGGRAVATING CIRCUMSTANCES

Appellant also asserts that the trial court erred during the penalty phase in overruling his objection and submitting Instruction 23 to the jury, concerning statutory aggravating circumstances.

The jury found all three statutory aggravators that were submitted in the instruction, with respect to the killing of Debbie Rainwater: (1) that the murder of Debbie Rainwater was committed while Appellant was engaged in the commission of the unlawful homicide of Stephen Rainwater, (2) that Appellant by his act of murder knowingly created a great risk of death to more than one person by means of a weapon that would normally be hazardous to the lives of more than one person, and (3) that the murder of Debbie Rainwater was outrageously or wantonly vile, horrible or inhuman because it involved depravity of mind in that Appellant killed her as part of a plan to kill more than one person, and thereby exhibited a callous disregard for the sanctity of all human life. *See section 565.032.2(2), (3) and (7)*. Appellant argues that the first and third of these statutory aggravating circumstances were not supported by the evidence and also were duplicative, thus resulting in instructional error rendering the death penalty arbitrary and capricious.[10]

---

**9.** Although Appellant cites and relies on both *State v. Dexter*, 954 S.W.2d 332 (Mo. banc 1997), and *State v. Zindel*, 918 S.W.2d 239 (Mo. banc 1996), neither case is apposite. In both of those cases, the prosecutor adduced evidence that the defendant invoked his right to remain silent *during a custodial interrogation*, and the prosecutor repeatedly attempted to show and argue to the jury that the defendant was guilty because he had done so. Nothing like that occurred in the instant case.

**10.** Appellant does not attempt to dispute that there was sufficient evidence to support the second statutory aggravating circumstance found by the jury. Moreover, the record reveals that this circumstance was supported by evidence showing that Appellant created a great risk of death to the baby by the manner in which he shot Debbie Rainwater as she was holding the baby in her arms.

## A. Alleged Lack of Evidentiary Support for Statutory Aggravators

 Appellant argues that the first statutory aggravating circumstance—that the murder of Debbie Rainwater occurred "while" Appellant was engaged in the commission of the unlawful homicide of Stephen Rainwater—is not supported because the evidence showed that Appellant did not shoot both of them at precisely the same time. However, the shootings did not have to occur at precisely the same time in order for this statutory aggravating circumstance to apply. Rather, the shooting of Debbie Rainwater occurred "while" Appellant was engaged in the commission of the unlawful homicide of Stephen Rainwater, within the meaning of section 565.032.2(2), because there was evidence to show that both murders were committed pursuant to a common scheme to kill the entire Rainwater family, including Stephen Rainwater. *See State v. Johnson*, 968 S.W.2d 123, 125–126, 135 (Mo. banc 1998); *State v. Smith*, 944 S.W.2d 901, 909, 925 (Mo. banc 1997).

 Appellant is likewise incorrect in asserting that the evidence did not support the third statutory aggravating circumstance—that the murder of Debbie Rainwater was outrageously or wantonly vile, horrible or inhuman because it involved depravity of mind, in that Appellant killed her as part of a plan to kill more than one person. This finding was amply supported by the evidence showing that Appellant revealed his plan of mass murder in the threat that he made to Abbey Rainwater about what would happen if she told anyone that he beat her. The jury could reasonably infer from this that Appellant was *attempting to carry out that plan* when he killed the victims.

## B. Alleged Duplicativeness

 Appellant further argues that the first and third statutory aggravating circumstances, discussed above, are duplicative of each other since they both assert that Appellant's conduct as to Debbie Rainwater could warrant the death penalty because he was also trying to kill Stephen Rainwater. Thus, Appellant contends, they allowed the jury "to double-count the same conduct" in weighing aggravating circumstances against mitigating circumstances and deciding whether to sentence Appellant to death. However, this Court has repeatedly rejected similar arguments that the statutory aggravating circumstances are impermissibly duplicative. *State v. Christeson*, 50 S.W.3d at 271. Moreover, only one valid statutory aggravating circumstance is needed to consider imposition of the death penalty, *State v. Brown*, 902 S.W.2d 278, 293 (Mo. banc 1995), and a defective additional aggravating circumstance therefore usually affords a defendant no basis for relief. *State v. Black*, 50 S.W.3d 778, 791 (Mo. banc 2001). Thus, even assuming *arguendo* that some duplicativeness occurred with regard to the first and third submitted statutory aggravators, it would not have been prejudicial in the case at bar.

## IX. ALLEGED IMPROPER VOIR DIRE COMMENTS

Appellant also claims that the trial court erred during voir dire by (a) not declaring a mistrial *sua sponte* when the prosecutor made statements to the effect that both sides would likely present evidence in the case, (b) sustaining the State's objections to some of defense counsel's questions, and (c) not declaring a mistrial *sua sponte* because the prosecutor stated that the jury should consider all of the evidence in the case rather than basing its decision on any one "single factor." As Appellant ac-

knowledges in his brief, none of these three claims was preserved for review; we therefore can review only for manifest injustice under the plain error rule, Rule 30.20.

### A.

■ With respect to several statements the prosecutor made suggesting the jury likely would hear evidence from both sides, the record reveals that, contrary to Appellant's argument, when taken in context these statements did not misstate the law or mislead the jury as to the burden of proof. Rather, as in *State v. Christeson,* 50 S.W.3d at 266, they were legitimate attempts "to explain the mechanics of the trial process and the role of the jury in assessing evidence presented by the state or by the defendant."

### B.

■ With respect to a few instances in which the trial court sustained the prosecutor's objection to defense counsel's questions about whether venirepersons could consider a life sentence even if Appellant did not present mitigating evidence, defense counsel was permitted to rephrase the question in a way that substantially addressed the State's burden of proof on the issue of punishment. Moreover, Appellant has not established that this alleged error could have been prejudicial in light of the fact that he did later present mitigating evidence.

### C.

■ With respect to the statement which the prosecutor made several times during voir dire that "no single factor" should be key to the jury's decision but rather the jury should consider all the evidence in the case, the record does not fairly support Appellant's argument that this misstated the law when taken in con-

text. Nor does it support Appellant's claim that the statement somehow misled the jurors into believing that they could impose a death sentence even without finding a single statutory aggravating circumstance, or that they could impose a death sentence if they found that the evidence in aggravation did not outweigh the evidence in mitigation.

■ Further, even if the three items discussed above were deemed erroneous, the jury was properly instructed on all issues relevant to the prosecutor's comments during voir dire; and there is no plausible indication in the record that any of the complained of comments or objections had a decisive impact on the trial's result. Thus, they do not meet the standard of manifest injustice necessary for plain error relief.

## X. CLAIM THAT DEATH PENALTY DECISION WAS RACE–BASED

Finally, in a single point on appeal, Appellant lumps together the following multifarious claims of error, which Appellant contends show that the decisions to seek and impose the death penalty in his case were based on the fact that "he is a black man who killed a white woman." According to Appellant, the trial court erred in: (1) rejecting Appellant's claim that the death penalty is inherently unconstitutional; (2) overruling Appellant's pre-trial motion that sought to preclude the State from seeking a death sentence on grounds that the prosecutor sought death because of Appellant's race; (3) rejecting Appellant's challenge to the Cape Girardeau County jury selection procedures; (4) refusing to allow Appellant's proposed jury questionnaire to be submitted to the venirepersons; and (5) plainly erred in not declaring a mistrial *sua sponte* at several points when the prosecutor referred to the fact that

Appellant is black. For the following reasons, we find no merit in these claims.

## A. Constitutionality of Death Penalty

 Appellant maintains the trial court erred in denying his motions to dismiss or preclude a death sentence, on grounds that the State has unconstitutional discretion to seek the death penalty, and that this Court conducts allegedly unconstitutional proportionality review. However, this is a court of precedent, and our prior decisions rejecting these claims remain valid. *See State v. Barnett*, 980 S.W.2d 297, 308–309 (Mo. banc 1998); *State v. Rousan*, 961 S.W.2d 831, 854–55 (Mo. banc 1998).

## B. Claim That Prosecutor Sought Death Penalty Due to Race

### 1. *Relevant Background Facts*

On the day before trial, Appellant filed a motion to preclude the State from seeking the death penalty, on grounds that the prosecutor had allegedly sought the death penalty due to Appellant's race. This motion alleged that the prosecutor was racially biased against Appellant because of something he had written, during trial preparation, in the margin of a copy of a written report by one of the defense experts. The expert's report had stated, in part: "At the time of my evaluation, [Appellant] was extremely suspicious and unwilling to share much with me. He confided to an attorney that he, like his stepfather, did not trust white people." Next to that text, in the margin of the report, the prosecutor had written, "likes white girls though."

At the hearing that the trial court held on this matter, the prosecutor explained as follows:

> Those notes are mine. Notes parenthetically in the margin of [the expert's] report for the purpose of prompting possible cross examination of her during her deposition that was taken for the purpose of preserving her testimony.
>
> However, I think [defense counsel] is making this point up out of whole cloth. The fact of the matter is that part of the mental status in this case is attributed to [Appellant's] extreme distrust of whites. My note there, "Likes white girls, though," is a possible cross examination point that if he distrusts whites, then perhaps his relationship with Abbey Rainwater was inconsistent with this alleged dislike. The fact that that would somehow brand me or anyone else in my office a racist, I think, is frankly a good imagination and nothing more.

The trial court then denied Appellant's motion.

### 2. *Discussion*

 Although a prosecutor has broad discretion in choosing what to charge, the exercise of that discretion cannot be deliberately based upon race, religion or other arbitrary factor. *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). In order to establish such a constitutional violation, the proponent must prove not only a discriminatory effect in his case, but also that the prosecutor's decision was motivated by a discriminatory purpose. *State v. Taylor*, 18 S.W.3d 366, 376–377 (Mo. banc 2000). Because discretion is essential to the criminal justice process, courts require "exceptionally clear proof" before finding that the prosecutor's discretion has been abused. *Id.* at 377 (citing *McCleskey v. Kemp*, 481 U.S. 279, 297, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)). Given these standards, coupled with the strength of the evidence against Appellant and of the existence of statutory aggravating circumstances, the trial court was entitled to find that the prosecutor's explanation for his margin no-

tation was credible. Appellant did not present "exceptionally clear proof" that the prosecutor's office sought the death penalty in this case because of his race, rather than because of the fact that he committed a heinous double homicide.

### C. Cape Girardeau County Jury Selection Procedures

On this claim, Appellant merely alludes to and attempts to rehash the claim of improper jury selection procedures raised elsewhere in his brief. As was discussed earlier in this opinion, the jury selection procedures employed in Appellant's case were not shown to be racially discriminatory or unconstitutional.

### D. Refusing to Submit Appellant's Proposed Jury Questionnaire

■ Appellant contends the trial court erred and abused its discretion in refusing to submit his proposed jury questionnaire, part of which contained a number of questions concerning racial attitudes. (For example: "1. Please describe what dealings you have had, either personally or professionally, with people of different races; 4. If you are white, have you ever felt hostility from black people. If yes, please describe the circumstances and how you felt; 6. How do you feel about interracial dating?") The prosecutor objected to the questionnaire on grounds, *inter alia,* that it contained many open-ended questions that did not address the venirepersons' ability to follow the instructions of the court. Defense counsel responded, in part, that he wanted the venirepersons to take the time to fill out the questionnaire after arriving at the courthouse, and that the approximately 150 questionnaires could then be used by both parties during voir dire. Finding that this process would be a cumbersome and inefficient use of the court's time, the trial court denied Appellant's motion to submit the questionnaire.

■ We find no error or abuse of discretion in the trial court's ruling. Appellant's claim on this matter fails to recognize the cases holding that there is no constitutional right to the submission of written questions to a jury panel. *See State v. Parker,* 886 S.W.2d 908, 921 (Mo. banc 1994). "[I]ndeed, oral voir dire is preferred because it reveals credibility." *Id.* Moreover, Appellant has not shown that the trial court prevented him from orally asking any necessary questions during voir dire.

### E. Claim For Mistrial *Sua Sponte* Because Race Was Mentioned

■ Appellant also asserts that the trial court plainly erred when it failed to grant a mistrial on its own motion when the prosecutor in several instances elicited from witnesses the fact that Appellant is black and other parties were white. However, our review of the specific transcript pages, containing the examples that Appellant cites in support of this argument, clearly shows that with regard to the complained of references to race, the prosecutor was merely adducing evidence of race in a legitimate manner as one identifying feature. The following example, from the direct examination of Officer Paul Clark regarding what he observed after arriving at the crime scene, suffices to demonstrate this:

A. After Lieutenant Wallace advised that he had moved away from the window, after that a subject came to the front door.

Q. You say a subject. Did this appear to be the same person, or could you tell?

A. I could not tell, no.

Q. Who, if anyone, was with him?

A. He was still holding the baby in front of him, and there was another young female that was behind him.

Q. When the man—When this person had been at the window, could you tell if it was a man or a woman?

A. No.

Q. Could you tell whether they were black or white?

A. Black.

Q. When the person came to the door, could you tell whether it was a man or a woman?

A. As he came out the door.

Q. And what then—You say he, so you must have decided it was a man?

A. Yes.

Q. And did this person appear—Did this person appear to be black or white, the person who came out the door?

A. A black male.

Thus, Appellant's argument on this claim as well lacks merit.

## XI. INDEPENDENT REVIEW

Under section 565.035, this Court is required to determine, in each death penalty case, whether:

(1) the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) the evidence supports the jury's findings of a statutory aggravating circumstance;

(3) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence, and the defendant.

■ Having thoroughly reviewed the record, this Court concludes that the punishment imposed was not the product of passion, prejudice, or any other arbitrary factor.

■ We next review the record to determine if the evidence supports, beyond a reasonable doubt, the existence of one or more statutory aggravating circumstances. In this case, as noted earlier, the jury found three statutory aggravating circumstances with respect to the murder of Debbie Rainwater. We hold that the evidence supports the jury's findings on the aggravating circumstances that: (1) that the murder occurred while Appellant was engaged in the commission of another unlawful homicide, (2) Appellant by his act of murder knowingly created a great risk of death to more than one person by means of a weapon that would normally be hazardous to the lives of more than one person, and (3) the murder involved depravity of mind in that Appellant killed Debbie Rainwater as part of a plan to kill more than one person and thereby a exhibited callous disregard for the sanctity of all human life.

■ Finally, this Court concludes that the death sentence in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence, and the defendant. This Court has often upheld death sentences where the defendant murdered more than one victim. *See, e.g., State v. Christeson,* 50 S.W.3d at 273; *State v. Smith,* 32 S.W.3d 532, 559 (Mo. banc 2000); *State v. Ringo,* 30 S.W.3d 811, 826 (Mo. banc 2000); *State v. Johnson,* 968 S.W.2d 123, 135 (Mo. banc 1998); *State v. Ramsey,* 864 S.W.2d 320, 327 (Mo. banc 1993). This Court has also upheld death sentences when the murder involved depravity of mind showing a callous disregard for the sanctity of all human life. *Christeson,* 50 S.W.3d at 273; *State v. Wolfe,* 13 S.W.3d 248, 265 (Mo. banc 2000); *State v. Middleton,* 995 S.W.2d 443, 467 (Mo. banc 1999); *State v. Johnson,* 968 S.W.2d at 135; *State v. Rou-*

*san,* 961 S.W.2d 831, 854 (Mo. banc 1998). Additionally, the death sentence has been upheld when a defendant murders someone who is helpless and defenseless, as Debbie Rainwater was when Appellant shot her. *See State v. Barton,* 998 S.W.2d 19, 29 (Mo. banc 1999); *State v. Clayton,* 995 S.W.2d 468, 484 (Mo. banc 1999). Considering the crime, the strength of the evidence, and the defendant, the death penalty in this case is not excessive or disproportionate.

The judgment is affirmed.

All concur.